Marcia McKITTRICK, Appellant,

v.

The STATE of Texas, Appellee.

No. 51364.

Court of Criminal Appeals of Texas.

Sept. 20, 1976.

Charles L. Caperton and Kenneth E. Labowitz, Dallas, for appellant.

Carol S. Vance, Dist. Atty. and Phyllis Bell, Robert C. Bennett, Jr., Asst. Dist. Attys., Houston and Jim D. Vollers, State's Atty. and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal arises out of a conviction for murder with malice under the former Penal Code. Punishment was assessed in a bench trial at ten (10) years' confinement in the Department of Corrections.

On original submission the appeal was abated because the trial court failed to file its findings of facts and conclusions of law regarding the voluntariness of the appellant's confession. See *McKittrick v. State,* 535 S.W.2d 873 (Tex.Cr.App.1976). There, it was held that the requirements of Article 38.22, Vernon's Ann.C.C.P., and *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), requiring the trial court to make such findings must be followed whether the defendant objects to the failure of the court to follow the statutory duty or not. See *Hester v. State,* 535 S.W.2d 354 (Tex.Cr.App.1976). A supplemental transcription has now been filed reflecting such findings and conclusions. The appeal has now been reinstated.

The indictment returned on April 25, 1973, alleged that on or about September 24, 1972, Bobby Vandiver and the appellant McKittrick "did with malice aforethought kill John Hill by shooting him with a gun." Proof showed that Hill was a medical doctor.

The sufficiency of the evidence to sustain the conviction is not challenged. In appellant's sole ground of error she states:

"The trial court erred in denying appellant's motion to suppress her confession of September 25, 1973, because said confession was coerced and involuntary; the circumstances under which the confession was obtained reveal that her protected rights were violated in its production."

The evidence presented during the hearing on the pre-trial motion to suppress was voluminous and contains an exhaustive examination into all aspects of the events leading to appellant's confession.

The record reflects that the indictment was returned on April 25, 1973. On May 14, 1973, the appellant, accompanied by her attorney, Charles Caperton of Dallas, posted bond. On May 25, 1973, the appellant was arraigned. Her counsel was present.

Detective J. W. Carpenter of the Houston City Police Department, Homicide Division, testified he had been active in the investigation of the shooting death of Dr. John Hill. Carpenter related he was present at the arraignment of the appellant and that subsequently on a date not made clear by the record[1] he was contacted by Detective Hargraves of Lubbock, where the appellant had been arrested for prostitution, and who stated appellant wanted to talk to Carpenter. Appellant told Carpenter she wanted to come to Houston to discuss the murder indictment against her, and Carpenter arranged for the Lubbock police to put her on a plane for Houston. Carpenter waited for her, and when she failed to arrive as scheduled, he checked and discovered she had deplaned at a stop in Austin.

After this event, appellant's counsel, Caperton, filed a motion for a temporary restraining order and permanent injunction to enjoin Carpenter and all other peace officers from contacting or harassing the appellant. Carpenter later learned the matter was moot when neither the appellant nor her attorney appeared for a hearing on the said motion.

On September 24, 1973, at 7 p. m. Carpenter received a telephone call from a Dallas city detective. When he returned the call, he was informed that appellant was in custody in Dallas on several charges and wanted to talk with Carpenter about a murder case. Carpenter talked with the appellant, who said she wanted to "get her business straight" about the John Hill murder case, and that she was sincere about it this time, and her bondsman "had gone off her bond" in the murder case. When Carpenter inquired about her lawyer, appellant informed him Caperton didn't represent her any more and had told her to do anything she wanted to do. Carpenter told her that if there was an outstanding capias for her he would come to Dallas to pick her up. Carpenter then learned that the bondsman "had gone off the bond" and there was an outstanding capias. He then called the appellant and told her he was on his way to Dallas. She requested a change of clothes, and Carpenter obtained some from his wife and then picked up his partner, Detective Gamino, and arrived in Dallas between 11:30 p. m. and midnight. They secured appellant's release in about an hour, and Carpenter then asked if she had been given her warnings, and she replied she had been before a judge, and in response to Carpenter's question told him she knew she didn't have to talk to them. Around 1 a. m. they stopped in a gas station and the appellant changed clothes. Appellant told Carpenter she was "dope sick," and he observed she was having chills and was in some discomfort. About 3 or 3:30 a. m. they stopped at a truck stop and all had breakfast, and Carpenter said he gave her two aspirins for her discomfort when they had coffee. He recalled that on the trip she asked about getting some methadone, and he replied he

1. It appears the date in question was about June 12, 1973.

didn't know, he would have to check on what was available when they got to Houston. Carpenter revealed they reached Houston about daylight, and the "case wasn't discussed on the way back to any extent." They arrived at the Homicide Division, and appellant went to the restroom with a female detective and had coffee, and they then waited "for the first judge to get there."

It appears that at 9:35 a. m. the appellant was taken before a magistrate, Judge Mike Breen, and Carpenter testified the Judge gave her the warnings found on the face of the subsequent confession, which are in accordance with Articles 15.17 and 38.22, Vernon's Ann.C.C.P., and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Then at 9:50 a. m. Carpenter began to interrogate the appellant about the charge against her. At 11:20 a. m. appellant signed the typed statement in the presence of witnesses after she had read the confession, including the warnings thereon.

Carpenter testified he had no trouble communicating with appellant while taking her confession, that she was an intelligent girl, communicated in an intelligible manner, and was able to understand what she was revealing and knew "what was going on around her." He related she had her "wits about her," was not crying or emotionally distressed. He stated that while she had complained of chills, discomfort, etc., on the trip from Dallas and stated she felt bad, she also stated when asked if she wanted to give a confession that she felt "like going ahead" and asked and was given coffee.

Carpenter testified that he made no threats or promises to her, nor did he use coercion to obtain her written statement. He told her he could not help her in connection with any of the charges in Dallas County, but would talk to the Harris County District Attorney's office to see if they would make an offer as to her testimony in the murder case. He testified that she had not asked for nor was she denied food, rest,

sleep, etc., that appellant's confession had been freely and voluntarily given.

Carpenter later testified that *after* the confession was taken he took the appellant to the Repose Clinic at St. Joseph's Hospital, and the appellant talked with a nun and a doctor. The doctor then decided she was not eligible for methadone, but did give her three prescriptions without any examination.[2] The prescriptions were lomotil for diarrhea, amytal as a sedative and valium. Carpenter paid to have the first two prescriptions filled, but not the third as the appellant stated she would not take valium. He was reimbursed by the police department.

Lillian Duke, registered nurse at the Harris County Jail, called by the appellant, testified that the appellant came into her custody at 2:30 p. m. on September 25, 1973, after being booked into jail at 1:45 p. m. and having taken two capsules of sodium amytal at 2:15 p. m. At the time appellant was semi-conscious, was having difficulty with her respiration, and seemed to have had an overdose of drugs. There were fresh needle marks on her arm. She was given artificial respiration and liquids. The nurse stated that the appellant had come to jail with a bottle of 98 sodium amytals, the prescription having called for 100 capsules; that amytal was a barbiturate which affects the central nervous system, and would account for appellant's semi-conscious condition. It was related that after treatment appellant slept for 24 hours.

Robert Walker, administrator for the medical division of the Harris County Sheriff's department, also called by the defense, stated he saw the appellant a few hours after admission into the jail and described her as being in a semi-comatose state.

Testifying in her own behalf, the appellant stated after the arraignment on May 25, 1973, Assistant District Attorney Bob Bennett approached her and asked if she knew what immunity meant and offered her immunity for her testimony in the case

2. See and cf. *Haney v. State,* (Tex.Cr.App., #51,733, delivered July 14, 1976).

and mentioned something about paying a month's rent on her apartment. She related that Caperton, her attorney, told her not to talk "to them," and she didn't. She stated the next day as she was leaving Houston for West Texas two men not in uniform grabbed her at the airport and said they were Texas Rangers. She struggled, lost her plane ticket, but retained her purse, ran up an escalator, and took a taxi cab and made her escape.

She testified she had been arrested in Lubbock about June 12th for prostitution, paid her fine and had gone back to her motel when two hours later at night Detectives Hargraves and Cooper arrived and took her back to the Lubbock Police Department. There they mentioned Carpenter's name and tried to persuade her to go to Houston. She told them she was on bond and had an attorney, but they refused to permit her to call Caperton, telling her they didn't trust him, that Caperton was "in league" with Percy Foreman, who was paying Caperton to get her the electric chair and get Foreman's client off. The appellant admitted that the next morning she talked to Detective Carpenter over the telephone, that Carpenter talked to her about immunity, told her not to contact Caperton as he (Carpenter) didn't trust Caperton, that if she cooperated she wouldn't need a lawyer. She stated she agreed to talk "to them" if they were going to persist in picking her up, but that she wanted Caperton present when they did.

The appellant then related that afternoon the Lubbock officers placed her on a plane for Houston after inquiring if the flight was a direct flight to Houston, not realizing there is a difference between a non-stop flight and a direct flight. When the plane stopped in Austin, she got off the plane and called her lawyer in Dallas. Thereafter, the earlier described motion for restraining order, etc., was filed.

Appellant testified she was again arrested in Dallas on September 21, 1973, on various charges (auto theft, theft over $50, forgery, passing worthless checks)[3] and that night she called Caperton. She revealed that at the time she had been a narcotic addict using heroin since December, 1972, and was using six to eight grams a day. She related that as soon as she was booked in Dallas she was told that she was wanted in Houston as her bond had been forfeited, that Dallas officers told her she was "definitely going to talk to Houston," and if she didn't, "they were going to do something to me," which she interpreted as a threat of physical harm. She had no recollection of ever having talked to Carpenter from Dallas and denied telling him Caperton didn't represent her any longer. She related that Houston officers, Carpenter and Gamino, picked her up in Dallas and took her to Houston, that on the way Carpenter gave her a pill which was not aspirin, but was smaller and very bitter, that it eased her withdrawal pains, and she just "blacked out." She admitted that she signed the confession in question, but stated that she did so because Carpenter promised her narcotics if she did and also promised her immunity.[4] She stated she asked to contact Caperton, but was told that if she did she would be an old lady before she ever saw her son again. She did remember taking a polygraph examination after the confession was taken. She vaguely recalled going to the St. Joseph's Hospital, but did recall Carpenter putting two blue amytals in her mouth and that she swallowed the same without water. She could not explain why the jail records showed she had taken two pills at 2:15 p. m. on September 25, 1973, unless they gave her additional pills at that time.

Dr. Stan Shoemaker, a physician at the Parkland Hospital in Dallas, testified for the defense that he examined the appellant on September 22, 1973, at the hospital upon

---

3. At the time of the hearing on the motion to suppress, appellant related she had been convicted of a number of these charges and was serving time in the Department of Corrections.

4. She stated that Carpenter told her *before* the confession he would see that she got immunity, but that *after* the confession was signed he told her that if he couldn't get her immunity he would see she got probation.

a referral from the Dallas County Jail. He found that she had a urinary tract infection which could be accompanied by chills. He prescribed an antibiotic drug. He learned from the appellant she was a narcotic addict and that she had taken her last "fix" at 4:30 p. m. on September 21st. As she appeared nervous and anxious, he gave instructions to the police officers for general morphine support therapy for withdrawal and wrote a prescription for a minor sedative, librium. Dr. Shoemaker testified that for a person taking six to eight grams of heroin a day the peak withdrawal period occurs between 48 and 72 hours. If the last dose was taken on September 21st, then the peak would have been reached between 4:30 p. m. on September 23rd and 4:30 p. m. on September 24th, and the peak would have passed by 9 a. m. on September 25th, and the subject would then be on the down side of the withdrawal period, although symptoms of the withdrawal can continue for seven to ten days.

There was also introduced into evidence an affidavit executed by the appellant in the Dallas County Jail before a notary public on September 24, 1973, to the effect that she was represented by Caperton, recounted her Lubbock experience, restated her fear that Houston officers would again attempt to interrogate her since she was no longer on bond and since Dallas officers had already indicated Houston officers wanted to talk to her.

Officer Gamino, called in rebuttal, testified that Carpenter did not give the appellant any type of drugs on the trip from Dallas but may have given her aspirin as Carpenter used aspirin himself. He testified that she did not pass out or become unconscious on the trip, though she may have fallen asleep for a while, but she did not seem disoriented or confused, that while she appeared tired or sleepy, she did not appear to be suffering any discomfort.

As earlier noted, the findings of facts and conclusions of law by the trial court are before us. Such instrument reads in part as follows:

"In support of the Court's action, the Court finds the following facts:

"1. That the defendant was arrested September 21, 1973 at about 5:30 p. m. by the Dallas Police Department officers for the offenses of auto theft, felony theft, forgery and passing worthless checks. The defendant subsequently was convicted of these offenses and sentenced to the Texas Department of Corrections. The records of the Dallas Police Department indicate that at 6:30 p. m. on September 21, 1973, a warrant for the arrest of the defendant existed in Harris County for the offense of murder.

"2. During the evening shortly after her arrest, the defendant was allowed to call an attorney.

"3. On September 22, 1973, at about 9:40 a. m., the defendant was taken to Dr. Stan Shoemaker at Parkland Hospital. The defendant was diagnosed as having a urinary infection. All vital signs were normal. The only signs of drug addiction were the verbal communications by the defendant and she appeared to be nervous and anxious. The defendant was released after the examination.

"4. The defendant remained in the Dallas jail until the early morning hours of September 25, 1973; at which time, she was released to Detective Carpenter and Detective Gamino of the Houston Police Department.

"5. Detective Carpenter first became aware that the defendant wanted to talk to him about the killing of Dr. Hill when he was contacted at home on the evening of September 24, 1973 between 6:00 and 7:00 o'clock p. m. Detective Carpenter then returned the call to Dallas; at which time, he talked to the defendant who told him she wanted to come to Houston and straighten out her situation in the murder case. Detective Carpenter inquired as to her situation regarding her attorney. The defendant indicated that she had talked to her lawyer and that she could do as she pleases. She then told Detective Carpenter that she was sincere about coming to Houston to talk about

the facts concerning the murder. Detective Carpenter then checked to verify the existence of an outstanding warrant and then called Dallas back and told the defendant that he would come to Dallas and bring her back to Houston if that is what she wanted. The defendant asked Detective Carpenter to bring her some clothes when he came to pick her up.

"6. Detective Carpenter and Detective Gamino arrived in Dallas between 11:30 and midnight and made arrangements to bring the defendant to Houston. When Detective Carpenter met the defendant, she said she was ready to go and did voluntarily leave Dallas with Detectives Carpenter and Gamino.

"7. During the trip to Houston, the defendant was allowed to change clothes and was allowed to eat breakfast. The only discomfort of the defendant evident to Detective Carpenter was that she had chills and complained of stomach cramps. Detective Carpenter gave the defendant two aspirins on the way back to Houston.

"8. During the trip to Houston, Detective Carpenter and the defendant discussed the fact that she had been before a judge in Dallas and defendant was aware that she did not have to talk to Detective Carpenter.

"9. After Detectives Carpenter and Gamino and the defendant arrived in Houston, the defendant was taken to the Homicide office where she was allowed to use the restroom and was given coffee to drink.

"10. Later that morning at 9:35 o'clock a. m., the defendant was taken before Houston magistrate Judge Mike Breen, who informed the defendant of the accusation against her, that she has the right to retain counsel, that she has the right to have an attorney present during her interview with peace officers or attorneys representing the state, that she has the right to terminate the interview at any time, that she has the right to request appointment of counsel if she cannot afford counsel, that she has a right to an examining trial, that she has the right to remain silent and that she is not required to make any statement, and any statement she makes may be and probably will be used against her.

"11. That, thereafter, the defendant gave a confession and signed it in the presence of witnesses after the same was reduced to writing and the defendant had been given an opportunity to and did read the same.

"12. That defendant was then given a polygraph examination concerning the confession.

"13. That the defendant at no time requested counsel to advise her from the time she left Dallas until the statement was completed.

"14. That even though the defendant was experiencing discomfort from the last stages of withdrawal, she was not under the influence of any drugs or the promise of any drugs which led to her giving the confession.

"15. That the defendant is a mature and intelligent individual; and there was no evidence of any over-reaching because of any different education-mental level between the officer and the defendant. The confession was not secured as the result of any promises made the defendant by the officer taking the confession or any other person.

"The Court bases its findings in this case after carefully examining the demeanor and the manner in which each witness testified. The Court paid particular attention to the defendant's testimony and noticed that on the critical issues she only responded to suggestive and leading questions. The Court further noticed that her testimony on cross examination was totally illogical in comparison with her testimony on direct examination and that even she became aware of this conflict and then tried to change her testimony to corroborate what she had said during direct examination.

"The Court therefore finds, from the above facts, that the statement marked State's Exhibit No. 1 was given by the defendant, _ _ _, freely and voluntarily without threats, improper influence,

any promises, persuasion or compulsion after she knowingly and intelligently waived the presence of counsel and her right to remain silent; and that the defendant was alert and mentally competent and was not induced by the influence of any drugs at the time the confession was made; that these findings of fact are made by the Court as a result of the hearing held in the absence of a jury and prior to any further proceedings in this cause."

We do not understand the appellant to complain that the warnings given by the magistrate prior to the confession or those on the face of the confession form do not conform with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or Article 38.22, Vernon's Ann.C.C.P. It is appellant's complaint that the evidence is insufficient to show an affirmative waiver of the right to counsel and the privilege against self-incrimination as required by the *Miranda* decision and the provisions of Article 38.22, supra.

*Miranda*, of course, teaches that a heavy burden rests upon the prosecution to prove that a person in custody "knowingly and intelligently" waived his privilege against self-incrimination and his right to retained or appointed counsel, 384 U.S. at 475, 86 S.Ct. at 1628.

■ The determination of whether there has been such an intelligent waiver must depend upon the particular facts in each case, including the background, experience, and conduct of the accused. See *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Thus, courts must approach the question of waiver in each case on an *ad hoc* basis. *Narro v. United States*, 370 F.2d 329, 330 (5th Cir. 1966). See also *McCandless v. State*, 425 S.W.2d 636, 640 (Tex.Cr.App.1968).

We turn now to an examination of the facts and circumstances in the instant case to determine if they sufficiently demonstrate a "knowing and voluntary" waiver of the right to counsel and the privilege against self-incrimination.

■ It appears that appellant had the same retained counsel before and after the confession. This court, however, has never interpreted *Miranda* to mean that once counsel has been requested or obtained the same forever bars law enforcement officers from interrogating an accused provided the prosecution sustains its heavy burden of showing an affirmative waiver. And this is particularly true where the accused initiates the conversation with the officers. See, e. g., *Self v. State*, 513 S.W.2d 832 (Tex.Cr.App.1974); *Caraway v. State*, 489 S.W.2d 106 (Tex.Cr.App.1973); *Nash v. State*, 477 S.W.2d 557 (Tex.Cr.App.1972); *Elliott v. State*, 444 S.W.2d 914 (Tex.Cr.App.1969); *Hill v. State*, 429 S.W.2d 481 (Tex.Cr.App.1968); *Gunter v. State*, 421 S.W.2d 657 (Tex.Cr.App.1967).

The face of the confession reflects a warning by a magistrate shortly before the confession was given and further reflects the appellant was warned:

"(1) Of the accusations made against me and of any affidavit filed; (2) That I have the right to retain counsel; (3) That I have the right to have an attorney present during my interview with peace officers or attorneys representing the State; (4) That I have the right to terminate the interview at any time; (5) That I have the right to request appointment of counsel if I cannot afford counsel; (6) That I have the right to an examining trial; (7) That I have the right to remain silent and that I am not required to make any statement, and any statement I make may be and probably will be used against me.

"*I fully understand all of these rights; and, desiring to waive all of them*, I hereby make the following voluntary statement to Jerry Carpenter."

The evidence shows that this confession was read and signed by the then 23 year old appellant, who had a prior criminal record and some experience with peace officers.

■ Such statements in a confession are factors to be considered in determining if the accused affirmatively waived his or her rights but is not determinative thereof.

*McCandless v. State*, 425 S.W.2d 636, 640 (Tex.Cr.App.1968); *Torres v. State*, 422 S.W.2d 741 (Tex.Cr.App.1968) (Concurring Opinion); *United States v. Hayes*, 385 F.2d 375 (4th Cir. 1967). See also *Encina v. State*, 471 S.W.2d 384 (Tex.Cr.App.1971); *Brookins v. State*, 499 S.W.2d 320 (Tex.Cr.App.1973).

 Here, we have more than a boilerplate statement in the confession. When Carpenter returned the call he had received from Dallas, he talked to the appellant, who told him she wanted to get "her business straight" in Houston and was sincere about it. Upon inquiry, she told Carpenter that Caperton no longer represented her as her lawyer and had told her to do anything she wanted to do. A short time after she had been warned of her rights by the magistrate she told Carpenter she felt "like going ahead" when asked if she wanted to give a confession. We conclude from the totality of the circumstances that the prosecution discharged its burden of showing an affirmative waiver of the right to counsel.

With regard to the waiver of the privilege against self-incrimination, in addition to all of the above, it is noted that when they left Dallas the appellant told Carpenter she had been before a judge and knew that she didn't have to talk to him. After receiving the magistrate's warnings, she agreed to give a confession, and at no time during the interrogation did she state she wished to remain silent or desired to terminate the questioning. We conclude that under the totality of the circumstances the prosecution demonstrated an affirmative waiver of the privilege of self-incrimination. See and cf. *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

 Of course, appellant's own testimony contradicted some of the testimony of the State's witnesses, but it is clear that where the facts are in dispute in a separate hearing on the voluntariness and admissibility of a confession, be it a hearing on a motion to suppress or otherwise, the trial judge is the trier of the facts and can accept or reject the testimony of the witnesses, including a defendant, in determining the issues before him. *Farr v. State*, 519 S.W.2d 876 (Tex.Cr.App.1975); *Horne v. State*, 506 S.W.2d 596 (Tex.Cr.App.1974); *Aranda v. State*, 506 S.W.2d 221 (Tex.Cr.App.1974); *Simmons v. State*, 504 S.W.2d 465 (Tex.Cr.App.1974); *Gutierrez v. State*, 502 S.W.2d 746 (Tex.Cr.App.1973). We conclude the trial court was supported by sufficient evidence in holding that there were affirmative waivers.

Appellant urges that her physical condition and state of mind at the time would show the confession was involuntary and that the waivers, if made, were not "knowing and intelligent" waivers. It is true that appellant testified she was addicted to heroin, and this is supported in some degree by the fact she had fresh needle marks on her arm. She did not testify as to when she had had her last "fix," but Dr. Shoemaker testified she told him that on September 22nd she had taken a "fix" at 4:30 p. m. on September 21st, that if she was taking six or eight grams she would reach the peak of her withdrawal period between 48 and 72 hours and would have been on the down side of her withdrawal at 9:50 a. m. on September 25th, at the time of the confession. This is supported by the fact that the doctor at the Repose Clinic would not give her methadone shortly after the confession was given. It is true she testified she was having chills and stomach cramps on the trip to Houston and Carpenter thought she was having chills. It is also true that Dr. Shoemaker testified chills often accompanied the urinary tract infection for which he treated her. The appellant also claimed Carpenter gave her a bitter pill, smaller than aspirin, and she blacked out. This was contradicted by Officers Carpenter and Gamino. Gamino testified she was not given any drugs and that she was able to sleep part of the time on the trip to Houston, that she was never confused or disoriented. Carpenter testified that at the time of the confession she had her "wits about her," etc. We cannot conclude her condition was such as to prevent her waivers from being "knowing and intelligent."

Appellant did testify that Carpenter promised her immunity and narcotics if she would confess, but this was denied by Carpenter and the trial court found no promises were made. The evidence supports such finding. Carpenter told her that he could do nothing about the charges in Dallas, but would talk to the Harris County District Attorney's office to see if they were interested in an offer for her testimony. The appellant may have mistakenly construed this as an offer of immunity, which it was not. Carpenter did testify that appellant inquired, on the trip to Houston, about methadone and he told her that he was not sure how methadone was dispensed, but he would check when he got to Houston.

We conclude from the totality of the circumstances that the confession was freely and voluntarily given by appellant after she had been fully apprised of her constitutional rights and had affirmatively waived these rights. *Encina v. State,* supra. The court did not err in overruling the motion to suppress.

The judgment is affirmed.