Leroy GREEN, Appellant,

v.

The STATE of Texas, Appellee.

No. 59380.

Court of Criminal Appeals of Texas, Panel No. 3.

Nov. 26, 1980.

Dissenting Opinion May 27, 1981.

Rehearing Denied June 3, 1981.

Thomas J. Purdom, R. Byrn Bass, Jr., Lubbock, for appellant.

Alton R. Griffin, Dist. Atty., Cindy L. Miller and Hollis Browning, Asst. Dist. Attys., Lubbock, Robert Huttash, State's Atty., Austin, for the State.

Before ODOM, TOM G. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

This is an appeal from a conviction for capital murder in which the jury returned negative findings upon the special issues submitted pursuant to Article 37.071(b), V.A.C.C.P. Appellant's punishment was assessed at life confinement.

The only evidence connecting appellant with the murder of Warren McKay is a written statement in which he confessed his participation in the aggravated robbery of the deceased and his wife, during the course of which Mr. and Mrs. McKay were shot and killed by Raymond Sanders, and Robert Lee White.

According to appellant's statement, he, Sanders and White armed with two shotguns, drove to the McKay home on the evening of January 12, 1975, and parked in the driveway. Warren McKay came out of the house and over to Sanders' pickup. Robert Lee White got out of the truck, walked around to the other front and pointed a shotgun at McKay. Appellant exited the pickup with the other shotgun which was not loaded. Appellant's written statement continues:

"Robert took the wallet from Mr. McKay and gave it to me. I opened it and looked into it. There was a one hundred dollar bill and some more. I do not know how much, then I gave it back to McKay. Raymond said wait a minute. Raymond and Robert brought Mr. and Mrs. McKay into the house, Mrs. McKay asked what are you going to do with us. Raymond told her we are not going to hurt you. I also said that we were not going to hurt you. Mrs. McKay asked is she could get a coat. She pointed to her and Mr. McKay's coat. We said okay, they put their coats on and Mrs. McKay asked if she could put on some shoes. Raymond said that you are just going down the street. We then took them out of the house. I asked Raymond where [sic] we were going to do with these damned people, and he told me to put them in the back of the pickup. I told him that it was cold back there, so Raymond told me not to back up now. Raymond said to the McKays, get in the back of the truck. I was already back there. Both of the McKays got into the back of the pickup where I was at. Robert got into the back of the pickup. Raymond got into the pickup and backed it up and then he drove off. We drove down a road real fast for a long time. We were laying down in the back. After awhile Raymond finally stopped the truck and I helped Mr. McKay out. They got out over the tailgate, then Mr. and Mrs. McKay started to walk off. Raymond told me what are you going to do, go ahead and shoot them. I told him that I did not have any shells. I asked Raymond, where are the shells, then Raymond took the shotgun away from me. I turned around and then I heard a shot and then another and another. It was three shots altogether that I heard. I turned around and saw the lady, Mrs. McKay, laying in the road.[1] She was laying on her stomach. I do not know if she was dead or not. I did not see the man, this being Mr. McKay. Robert and Raymond were walking back toward me. We got into the truck and drove off."

Sanders asked appellant how much money they had gotten and the latter counted out about $174.00. The concluding statement in appellant's account of the murders was, "I ... want to say that Robert and Raymond did shoot and kill Mr. and Mrs. McKay."

Appellant now complains in six grounds of error that his written statement should have been excluded from evidence [2] because

---

1. The bodies of Mr. and Mrs. Mckay were found about 100 yards from some tire tracks on the shoulder of the road which were later identified as having been made by Sanders' truck.

2. Specifically, appellant assails the trial court's actions in: (1) failing to grant his motion to suppress his written statement; (2) admitting the statement into evidence; (3) finding that his arrest was lawful; (4) failing to find there was an unnecessary delay in taking him before

it was obtained by exploitation of his detention pursuant to an illegal arrest, citing *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). We agree and accordingly reverse.

The record reflects that Mr. and Mrs. Dub Coffee lived a short distance from the McKay house. During the evening hours of the date of the murders, Mr. and Mrs. Coffee had been at home. At that time, three black men had come to their house. They knew that Raymond Sanders was one of those men, but they did not know who the others were.

As a result of law enforcement officers' talking to the Coffees, a search for Raymond Sanders ensued. The officers went to the house where Raymond Sanders lived and found out where he worked. They found a pickup that belonged to his employer and observed the tires on that pickup, as well as the tracks that they made. The officers compared those tracks and believed them to be the same as those found both at the Coffee and McKay residences. Likewise, the tracks compared favorably with those found on the shoulder of the road about 100 yards from where the bodies had been found.

Based upon all of the facts that they had at their disposal at the time, the officers obtained a search warrant for the home of Sanders. At the Sanders house, the officers seized two shotguns. Raymond Sanders was immediately arrested at his house and taken to the Lubbock County Sheriff's Office. Subsequent testing upon the weapons seized failed to reveal any fingerprints on them.

Upon arriving at the Sheriff's Office Justice of the Peace F. H. Bolen was summoned, and a complaint was sworn by Sheriff C. H. Blanchard against appellant, alleging he had committed the murder of War-

ren McKay; on presentation of this complaint to Judge Bolen, a warrant for appellant's arrest issued.

As soon as the arrest warrant issued for appellant, this fact was broadcast over police radio to some seven Lubbock County law enforcement officers and two Texas Rangers, who were already combing the county, investigating the whereabouts of Leroy Green and Robert Lee White.

After going into a few more residences and "joints," the officers came to a "project" complex at 2610 Weber Drive. Deputy P. R. Wilbanks and Ranger Tommy Walker, armed with shotguns, approached an apartment in which they believed appellant to be. It was approximately 2:00 a. m.

After knocking loudly a few times, other residents began to open their doors in the hall. Wilbanks asked a woman across the hall "if this is the residence of Leroy Green," and she replied that she thought so. So Walker knocked on the door again, but with the butt of his shotgun. The officers then decided to "go on ahead and force entry." Walker kicked the door twice, then Wilbanks kicked it, to no avail. So, both officers backed up and ran through the door knocking it off its hinges and the facing off the frame.

Inside, the officers first confronted appellant's mother, Adell Green, who had been on her way back to her bedroom to get a robe. According to Mrs. Green, she could not tell exactly who was there because flashlights were being pointed at her:

"... I went to pull the curtains back to see who it were and by the time I got the curtains back ... one of them said, 'Don't move' and I said, 'Well, I don't have any right to run ... will somebody please tell me what's going on?' and nobody ever said anything to me."

The officers started asking for Leroy Green and made their way into a bedroom where appellant and his brother, Sammy,

---

a magistrate; (5) failing to find appellant's arrest was without probable cause; and, (6) failing to find that the "voluntary statement of the accused" was obtained as a result of the illegal arrest and during a period of unnecessary delay

before taking him before a magistrate. Six additional grounds of error attack various rulings of the trial court concerning presentation of the confession for consideration by the jury at trial on the merits.

were sleeping. Shining flashlights and pointing shotguns at appellant and his brother, the officers asked if one of them were Leroy Green, and appellant jumped up, standing on his bed with his hands up and said, "Yes, I'm Leroy Green."

Appellant was then led toward the front door and handcuffed with his hands behind him. Dressed in only a T-shirt and undershorts, appellant was led out the front door and Ranger Walker recited to him his *Miranda*[3] warnings. The eighteen year old appellant was then taken outside and placed in a patrol car. It was 29° outside.

Though the testimony conflicted slightly, it appears that appellant asked the officers if someone could get him some clothes and, after circling the block, they returned to the apartment and asked someone to go in for some clothes. Appellant's brother went in and returned with a pair of pants, but no shoes or shirt.

The evidence clearly established that appellant was not taken to the Sheriff's Office for almost an hour.[4] Deputy Wilbanks explained the delay thus:

"We were still in the process of looking for another individual and Leroy Green was giving us some information as to how we might contact this third person and we were relaying this information to other officers via the radio and occasionally we would stop, might pull over to see what might turn up...."

According to Ranger Walker,

"Well, I was completely lost, I had no idea where in Lubbock that I was. I know that we questioned Leroy as to the whereabouts of [Robert Lee] White and we—he gave us some information, several addresses and we put them out on the air, maybe one address at a time. I remember stopping at one place while some deputies checked the address to see if White was there...."

The evidence is, however, undisputed that appellant was arrested sometime between 2:30 and 2:40 a. m., and booked in at the Lubbock County Jail at 3:30 a. m. The weight of the positive testimony, including that of a former Assistant District Attorney, is that appellant was brought in wearing nothing but his undershorts and T-shirt.[5]

Though Judge Bolen was still at the Sheriff's Office—and in fact remained there until approximately 5:00 a. m.—appellant was not taken before him at any time through that night.[6]

Once at the jail, appellant was first put in a room with "several officers." Ranger Horger warned him and talked to him briefly.[7] Then appellant was placed for a short time in a holdover cell, then brought out and booked. Thereafter, according to

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1975).

4. At trial on the merits, Deputy Wilbanks testified that soon after appellant was first warned, he asked the latter whether he waived his rights, and appellant simply said nothing.

5. The trial court failed to make any findings of fact regarding the factual details of the evening's events.

6. The warrant for appellant's arrest had specifically commanded that, upon his arrest, he be brought before Judge Bolen "instanter."
   Article 15.17(a), V.A.C.C.P. provides:
   "(a) In each case enumerated in this Code, the person making the arrest shall without unnecessary delay take the person arrested or have him taken before some magistrate of the county where the accused was arrested. The magistrate shall inform in clear language the person arrested of the accusation against

him and of any affidavit filed therewith, of his right to retain counsel, of his right to remain silent, of his right to have an attorney present during any interview at any time, of his right to request the appointment of counsel if he is indigent and cannot afford counsel, and of his right to have an examining trial. He shall also inform the person arrested that he is not required to make a statement and that any statement made by him may be used against him. The magistrate shall allow the person arrested reasonable time and opportunity to consult counsel and shall admit the person arrested to bail if allowed by law."

7. Horger testified that he told appellant that they "had Sanders in custody," that Sanders had "explained," and it was "no accident" that "[appellant] was in custody" and they were "looking for Robert White."

Deputy Sheriff Alton Hobbs, he first saw appellant at approximately 4:00 a. m. sitting where the latter had been moved to one of the "Investigative Offices." Deputy Earnest Rector, Ranger Frank Horger and Captain Montgomery were also present. Deputy Hobbs warned appellant and satisfied himself that appellant understood. According to the officers, appellant did not request a lawyer and indicated he wanted to talk.[8]

According to Hobbs, he and Rector[9] started taking appellant's statement at about 4:30 a. m. After listening to appellant's verbal account of the murders, Rector began to write the events down in longhand. Then Hobbs wrote in longhand until the narrative was recorded. Rector thereafter typed the content of the longhand notes on a statement form. After it was completed, the statement—beginning with warnings—was read to appellant as he read along from a copy. Corrections were made and appellant initialed them.

At 7:45 a. m., appellant signed the completed three page statement, which was witnessed by Captain Montgomery and Deputy Delwin Keesee. It was established that sometime during the 3½ hours it took to obtain the completed statement, appellant's mother and father came to the jail and attempted to see him, but they were told he would be unavailable that night.

Appellant's contention that *Dunaway v. New York*, and *Brown v. Illinois* govern the disposition of his conviction, is predicated upon the assertion that his arrest was unlawful.

The complaint in the form of an affidavit by Sheriff Blanchard, on which the warrant for appellant's arrest issued, alleged:

"Before me, Tommy Turner, Assistant Criminal District Attorney of Lubbock County, Texas, this day personally appeared C. H. Blanchard, who, after being sworn, upon oath says that *he has good reason to believe and does believe and charge that one Leroy Green* ... on or about the 12th day of January, A.D. 1975, and before the making of this complaint in Lubbock County, and State of Texas, *did* then and there *intentionally and knowingly cause the death of an individual, Warren Andrew McKay, by shooting him with a gun* AGAINST THE PEACE AND DIGNITY OF THE STATE.

[signed] C. H. Blanchard

Sworn and subscribed before me, this the 15th day of January, A.D. 1975.

[signed] Tommy Turner
Assistant Criminal District Attorney of Lubbock County, Texas."[10]

On the sole basis of the above complaint, Judge Bolen issued the warrant for appellant's arrest.[11] It is instantly apparent that

---

**8.** Appellant, of course, disputed this.

**9.** There was testimony that Ranger Horger was not present during the time the statement was being taken and we may infer from certain testimony that Captain Montgomery was also absent.

**10.** All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

**11.** During the hearing on appellant's motion to suppress, Sheriff Blanchard testified:

Q: ... Sheriff, were you in charge of the investigation of the murders of Warren and Odessa McKay?
A: Yes, sir.
Q: And you had taken an active part in the investigation itself, had you not?
A: That's correct.
Q: And you had been up and seen the bodies ... [a]nd saw the kind of wounds?

A: Yes, sir. * * * The wounds—naturally, this is through a process of checking, the wounds were determined to be made by a shotgun.
Q: Okay. You had been around taking an active part at several locations up near where the bodies were found and where the McKays lived and where the Coffees lived and the whole general area, had you not?
A: That's correct, yes, sir.
Q: And you did swear out a complaint before Tommy Turner, did you not?
A: Yes, sir, I did.
        *        *        *        *        *        *
Q: And these were then taken to Judge Bolen ...?
A: Yes, sir.
Q: Did you observe Judge Bolen issue the arrest warrants [for Leroy Green and Robert White]?
A: Yes, I did.
        *        *        *        *        *        *

this affidavit consists of nothing more than Sheriff Blanchard's conclusion that appellant perpetrated the murder described in the complaint.

In *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 91 S.Ct. 1031, 1035, 28 L.Ed.2d 306 (1971), the Supreme Court of the United States reiterated,

"The decisions of this Court concerning the Fourth Amendment probable cause requirements before a warrant for either arrest or search can issue require that the judicial officer issuing such a warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Rugendorf v. United States*, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Giordenello v. United States*, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958)."

We believe that the recent decision of this Court in *Knox v. State*, 586 S.W.2d 504 (Tex.Cr.App.1979), is dispositive of the issue concerning the validity of appellant's arrest here. In the words of Presiding Judge Onion:

"... [T]he Supreme Court has held that the exclusionary rule [is] applicable to State prosecutions, *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and that the same probable cause standards [are] applicable to federal and state warrants under the Fourth and Fourteenth Amendments. Still further, see Article I, § 9, Texas Constitution; cf. Article 38.23, V.A.C.C.P.

\*　　\*　　\*　　\*　　\*　　\*

Q: And prior to that time you were already looking for those individuals.... You had been checking various places, is that correct?
A: That's correct.
Q: And when you swore out the complaint you indicated—did you talk to Judge Bolen?
A: Yes, sir, I did.

The actual basis for the complaint's conclusion is omitted from the complaint. The complaint contains no allegations that the complainant spoke with personal knowledge of the matters contained [there] in and [does] not indicate any source for the complainant's belief, nor set up sufficient information to support an independent judgment that probable cause existed."

Thus it is clear that "[t]he magistrate here certainly could not 'judge for himself the persuasiveness of the facts relied on \* \* to show probable cause'." *Aguilar v. Texas*, supra, 84 S.Ct. at 1513, quoting *Giordenello v. United States*, supra, 78 S.Ct. at 1250. Judge Bolen necessarily accepted "without question" Sheriff Blanchard's "suspicion," "belief" or "mere conclusion" that appellant committed the offense described in Blanchard's affidavit in the form of a complaint. *Id.*; see also *Barnes v. Texas*, 380 U.S. 253, 85 S.Ct. 942, 13 L.Ed.2d 818 (1965); and after remand, *Barnes v. State*, 390 S.W.2d 266 (Tex.Cr.App.1965).

■ We are constrained to conclude that the affidavit before us provided Judge Bolen with no basis for an independent determination of probable cause and the arrest warrant that issued pursuant thereto, was invalid. *Knox v. State*, supra; *Evans v. State*, 530 S.W.2d 932 (Tex.Cr.App.1975); see also and compare *Lowery v. State*, 499 S.W.2d 160 (Tex.Cr.App.1973); *Kemp v. State*, 464 S.W.2d 141 (Tex.Cr.App.1971).

■ Furthermore, the record before us is devoid of evidence which would have authorized appellant's arrest without a warrant under the statutory law of this State. See Article 14.01, *et seq.*; see generally, *Lowery v. State*, supra.

Q: *Did you indicate to him what your personal knowledge of the case was?*
[Defense counsel]: Your Honor, I object to that *unless he was under oath.*
The Court: I'll sustain the objection.
[Prosecutor]: *I have no further questions.*

We therefore hold that appellant's arrest was unlawful, and the trial court erred in concluding otherwise.[12]

Having determined that appellant's arrest was in violation of the Constitution and the law of this State as well as the Fourth and Fourteenth Amendments to the Constitution of the United States, the question remains: whether the connection between appellant's unauthorized arrest and his incriminating statements obtained during his illegal detention was sufficiently attenuated to permit, at trial, the use of that statement? *Dunaway v. New York*, supra; and *Brown v. Illinois*, supra.

For its part in this appeal, the State argues only that the findings and conclusions of the trial court—that appellant's confession was *voluntary* under traditional Fifth Amendment notions—are supported by the record, and the admission of appellant's inculpatory statement into evidence was therefore proper.

The position urged by the State here is similar to that adopted by the New York Court of Appeals which prompted the Supreme Court's decision in *Dunaway v. New York*; the Supreme Court commented at 99 S.Ct. at 2259, 2260:

> "This betrays a lingering confusion between 'voluntariness' for purposes of the Fifth Amendment and the 'causal connection' test established in *Brown* [*v. Illinois*]."

In *Brown v. Illinois*, the Illinois Supreme Court had held that *Miranda* warnings in and of themselves broke the causal chain so that any statement was admissible so long as it was "voluntary" in the traditional sense and not coerced in violation of the Fifth and Fourteenth Amendments. In rejecting such a notion, the Supreme Court reasoned that it avoided resolving the question of whether statements obtained by exploitation of an illegal arrest, a Fourth Amendment violation, should be excluded.

Observing that application of the exclusionary rule in effectuating the Fourth Amendment serves policies and interests different from the Fifth Amendment, the Court held:

> "*Wong Sun*[13] requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' 371 U.S. at 486, 83 S.Ct. at 416. *Wong Sun* thus mandates consideration of the statement's admissibility in light of the distinct policies and interests of the Fourth Amendment."

99 S.Ct. at 2261.

The Court in *Brown v. Illinois* identified a finding of "voluntariness" as merely a "threshold requirement" for Fourth Amendment analysis; later, in *Dunaway v. New York*, the Court elaborated, "[i]ndeed, if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached." 99 S.Ct. 2259.

In the instant case, the trial court found that appellant was warned of his constitutional rights, and concluded that appellant thereafter gave his incriminating statement voluntarily. Because the trial court is the sole trier of fact at a hearing upon a motion to suppress, this Court is not at liberty to disturb any finding which is supported by the record, *McKittrick v. State*, 541 S.W.2d 177 (Tex.Cr.App.1976); we accordingly defer to those determinations.

Having determined appellant's confession was voluntary as a "threshold requirement," we turn now to the Fourth Amendment analysis prescribed by *Dunaway v. New York* and *Brown v. Illinois*, in order to determine whether the State has met its burden of establishing that appellant's con-

---

12. Because the trial judge concluded as a matter of law that appellant's arrest was legal, he necessarily failed to make findings and conclusions regarding any "causal connection" between the invalid arrest and appellant's written statement obtained later that night. The trial court, likewise refused to submit the "causal connection" issue to the jury over appellant's objection.

13. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

fession was not the product of his illegal arrest and detention.

■ As identified in *Brown v. Illinois,* supra, and reiterated in *Dunaway v. New York,* supra the factors to be considered in determining whether the confession has been obtained by exploitation of the illegal arrest, are

(1) whether *Miranda* warnings were given;

(2) the temporal proximity of the arrest and the confession;

(3) the presence of intervening circumstances; and,

(4) the purpose and flagrancy of the official misconduct.

The salient facts of the instant case are remarkably similar to those constituting the arrest, detention and confession of Brown. As Brown approached the door of his apartment in the early evening, he saw a pistol pointed at him through a window near the door. The stranger holding the revolver said, "Don't move, you are under arrest." Another came up behind him with a gun and again told him he was under arrest. Brown was told to stand against a wall and was searched. The officers found nothing.

On Brown's denial of his identity, he was shown a photograph of himself and told he was under arrest for murder. Brown was then handcuffed and escorted to a squad car. On arrival at the police station, Brown was placed in an interrogation room and warned by two officers. He was questioned and then told that a bullet known to have been fired by him was being compared with one found in the body of the deceased.

After Brown gave a statement, he was taken out to look for his co-defendant. After finding Brown's confederate, Brown was placed alone in an interrogation room for several more hours and gave a second statement which he refused to sign. Fourteen hours after his arrest, Brown was taken before a magistrate.

The officers testified that they had arrested Brown for purposes of questioning him as part of a murder investigation.

The primary factual differences between *Brown v. Illinois* and the instant case are that the arrest of appellant was effected in the middle of the night, with officers rousing him from sleep, pointing shotguns in his direction, then leading him out into freezing weather with no coat, outer clothing or shoes.

In determining that the State failed to meet its burden of proving that Brown's confession was obtained by means sufficiently distinguishable to be purged of the initial taint, instead of by exploitation of the primary illegality, the Supreme Court noted that the first statement was separated from the illegal arrest by less than two hours, and there was no intervening event of significance whatsoever.

In a statement we believe to be equally applicable to the instant case, the Supreme Court observed,

"The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they *repeatedly acknowledged,* in their testimony, that *the purpose of their action was 'for investigation' or 'for questioning'.... The arrest, both in design and execution, was investigatory.* The detectives embarked upon this expedition for evidence in the hope that something might turn up. *The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright and confusion."* 95 S.Ct. at 2262.

In the case before us, it was conceded by all the officers involved that they had been foraging Lubbock on an evidence expedition for some time before they found appellant. Sheriff Blanchard likewise confirmed that appellant was the object of a manhunt even before the warrant for his arrest issued. Though Sheriff Blanchard went through the formality of obtaining a warrant for appellant,[14] the entire course of conduct engaged in by the law enforcement community was patently investigatory in nature.

---

14. We are troubled by the fact that a warrant was obtained in 1975 on the basis of the Sher-

iff's manifestly insufficient affidavit in the form of a complaint, which is indistinguishable from

As in both *Dunaway v. New York* and *Brown v. Illinois*, the accused herein was given his *Miranda* warnings, but that event cannot alone serve to outweigh other factors extant.[15] Appellant began giving his confession approximately two hours after his arrest. The only intervening event of significance reflected by the record militates against the State: that after appellant's arrest, but before his arrival at the county jail, he was driven around the city with the officers as they continued their investigation of the murders and their search for Robert Lee White.

Interrogation of appellant began almost immediately on his arrival at the Sheriff's Office. Appellant's parents were denied access to him, and he was not taken before Judge Bolen even though the magistrate was in the building. Clearly, no intervening events broke the connection between appellant's arrest and confession. "To admit [appellant's] confession in such a case would allow 'law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the "procedural safeguards" of the Fifth'." *Dunaway v. New York*, supra, 99 S.Ct. at 2260.

■ We hold that the State has failed to meet its burden of showing that appellant's statement was admissible, and the trial court erred by permitting its introduction before the jury.

The judgment is reversed and the cause remanded to the trial court.

## DISSENTING OPINION TO DENIAL OF STATE'S MOTION FOR LEAVE TO FILE MOTION FOR REHEARING WITHOUT WRITTEN OPINION

McCORMICK, Judge, dissenting.

I believe the majority opinion fails adequately to address the reasoning behind the

the Lubbock County complaint condemned by the Supreme Court in 1965 in *Barnes v. Texas*, supra. For modern form that takes into account the *Barnes* holding see 7 Texas Practice 13, Morrison & Blackwell, Criminal Forms Annotated, §§ 1.04 and 1.05 and accompanying notes.

exclusionary rule as presented in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and the good faith of the officers in the execution of the arrest under the facts before us. Because the facts must be viewed with an eye toward how law enforcement reacted, a brief recital of the facts preceding the arrest is necessary.[1]

### I.

On the night of January 12, 1975, the Lubbock County Sheriff's Department discovered two bodies outside the rural community of New Deal. The bodies of an elderly couple were found lying face down and partially covered with snow. The victims, identified as Mr. and Mrs. McKay, had been killed by shotgun blasts in the backs. Deputies Hobb, Rector, and Hill proceeded to the McKay's house. Upon arrival, they found the house unlocked and unoccupied. An examination of the surrounding area disclosed the presence of automobile tracks that matched neither of the McKay's vehicles. The tracks appeared to be those commonly associated with a three-quarter ton pickup truck. The vehicle's tracks indicated that it had pulled up in the driveway, then backed out and left.

The next day, January 13, 1975, the officers also located a similar set of tracks at the nearby Coffee residence. Further, during the subsequent investigation of the murder scene, the officers again located an identical set of tracks matching those previously found. These latter tracks were approximately one hundred yards from where the bodies of the McKays had been found and showed that the vehicle had stopped on the shoulder of the road.

15. This was, in fact, the direct holding of the Supreme Court in *Brown v. Illinois*.

1. This is a companion case to *White v. State*, 591 S.W.2d 851 (Tex.Cr.App.1979).

At the Coffee residence, the officers learned that during the evening hours on the date of the murders, Mr. and Mrs. Coffee had been at home. At that time, three black men had come to their house attempting to sell corn for feed. The Coffees identified a Raymond Sanders as one of the men, but they did not know the other two. From a subsequent photographic lineup, Mrs. Coffee identified appellant.

As a result of the information obtained from the Coffees, a search for Raymond Sanders ensued. Upon ascertaining where Sanders was employed, the officers proceeded to a local farm. They found a pickup that belonged to Sanders' employer and examined the tires on that pickup. The officers also observed that the tracks made by the truck were identical to those found at the Coffee and McKay residences. Additionally, the tracks matched those found on the shoulder of the road near where the bodies were found.

On January 14, 1975, and pursuant to a search warrant, Raymond Sanders' home was searched. Seized were two shotguns hidden in the attic above the garage. Sanders was immediately arrested and taken to the Lubbock County Sheriff's office. At the Sheriff's office, Sanders confessed and made statements implicating appellant and another individual, Robert White.[2] Sanders also gave the officers a description of an automobile that the other two suspects may have been using. An immediate search began for appellant and White.

Involved in the county-wide search for appellant were Texas Ranger Tommy Walker and Deputy P. R. Wilbanks. In their search for appellant, the officers checked residences and a local "joint" that appellant was known to patronize frequently. It was during this period that the officers received word that a formal arrest warrant had been issued for appellant. The officers received the arrest warrant number (8021), the name of the arrestee (appellant), and the charge (murder).[3]

The officers, with knowledge of appellant's possible connection to the offense and with notice of the formal issuance of the arrest warrant, proceeded to a housing complex at 2610 Weber Drive. The officers approached the apartment in which they believed appellant to be. After knocking loudly for several minutes, a woman across the hall opened her door. The officers inquired "if this is the residence of Leroy Green", and she replied that she thought so. The officers repeated their knocking for approximately fifteen to twenty minutes. The officers then forced entry.

Inside, they encountered appellant's mother and other members of the family. In one of the bedrooms the officers confronted appellant and his brother. The officers asked if one of them was Leroy Green. Appellant jumped up, kneeling on his bed, and identified himself.

Appellant was immediately taken into custody, warned of his rights, and placed in the deputy's car. Appellant was originally apprehended in only a T-shirt and shorts. After appellant was placed in the car, the officers allowed appellant to request and receive clothing.[4]

---

2. The defendant confirmed Sanders' confession at the pre-trial hearing on the motion to suppress:

"A. Raymond Sanders was sitting right in front of this desk, in the room that's designated A, sitting in a chair on this corner facing me, and he said, 'Say, Leroy, man, I don't know what to tell you, man', he said, 'I done told them everything that happened', just like that. He said, 'Man, I didn't have no other choice.'"

Also see footnote 7 of majority opinion.

3. The arrest warrant was issued after the complaint sworn to by Sheriff Blanchard was presented to Justice of the Peace F. H. Bolen.

Although the confession of Sanders would adequately support the probable cause element of the arrest warrant, the affidavit failed to show sufficient facts to support the warrant. Therefore, the officers had probable cause to arrest but a defective arrest warrant.

4. The majority accepts appellant's version that the officers circled the block before getting the clothing. The officers' testimony, however, stated that they allowed appellant to acquire clothing before they left the housing complex.

Although it took from thirty minutes to an hour to deliver appellant to the sheriff's office, the delay was due to the ongoing search for a third suspect. Finishing the quote the majority started, Ranger Walker stated:

"... I know that we questioned Leroy as to the whereabouts of White and we—he gave us some information, several addresses and we put them out on the air, maybe one address at a time. I remember stopping at one place while some deputies checked the address to see if White was there, *but in general we didn't roam around town, we come generally straight on down to the jail.*" (Emphasis added)

Once the defendant arrived at the police station, he gave the statement which the majority recognizes to have been voluntary.

## II.

Regardless of the probable cause to arrest appellant without a warrant, the majority holds that the invalid arrest warrant vitiates the subsequent confession. However, I feel the application of the exclusionary rule to the confession obtained under the circumstances in this case inappropriate. This is so because the exclusionary rule is designed "to deter future unlawful police conduct" and not to repair "the personal constitutional right of the party aggrieved." *United States v. Calandra,* 414 U.S. 338, 347–348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561, 571 (1974). This deterrent function "necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. * * * Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." *Michigan v. Tucker,* 417

U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974). Accord, *Michigan v. DeFillippo,* 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).

As the majority has stated, the factors to be considered in determining whether the confession has been obtained by exploitation of the illegal arrest are (1) whether the rights guaranteed under *Miranda* were given, (2) the temporal proximity of the arrest and the confession, (3) the presence of intervening circumstances; and, (4) the purpose and flagrancy of the official misconduct. Since it is established that deterrence to police misconduct is the touchstone of the exclusionary rule, the fourth factor, *the purpose and flagrancy of the police misconduct,* must necessarily be the prime consideration. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Moreover, the warning of rights under *Miranda* is also of great importance.[5] It is these two prominent factors that must be closely scrutinized.

I have no disagreement that there was a close proximity of the confession to the arrest. Nor do I dispute the fact that there were no intervening circumstances between the time of the arrest and the subsequent valid confession. The problem arises in the "purpose and flagrancy of the official misconduct" and the "giving of the *Miranda* warnings."

The majority correctly points out that appellant was warned of his constitutional rights and that his confession was voluntary. Thus, the "*Miranda*" factor has been satisfied. Having overcome the threshold requirement that the confession is voluntary, however, the majority then concludes

---

5. In *Brown v. Illinois,* supra, 422 U.S. at 603, 95 S.Ct. at 2261, the Supreme Court stated:

"It is entirely possible, of course, as the State here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the *Miranda* warnings, alone and per se, cannot *always* make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession."

Further, although the Court dismissed a per se rule that *Miranda* warnings break the causal connection between the illegality and the confession, the Supreme Court soundly rejected the notion that *Miranda* warnings can *never* purge the taint:

"While we therefore reject the per se rule which the Illinois Courts appear to have accepted, we also decline to adopt any alternative per se or 'but for' rule." Supra 422 U.S. at 603, 95 S.Ct. at 2261.

that the warrant affidavit was insufficient, resulting in an illegal arrest.

From the facts in this record, I find that the officers had probable cause to arrest appellant. He had been identified to have associated with another suspect already in custody and closely linked with the brutal murders. The two arresting officers, while attempting to locate appellant, received word that an arrest warrant had been formally issued. Acting upon good faith belief that the warrant was valid, the officers proceeded to appellant's residence. Upon arrival, the officers repeatedly knocked and identified themselves. After approximately fifteen to twenty minutes, the officers forcibly entered the apartment. Although the entry was forced, such an entry based upon an arrest warrant does not infringe upon constitutional rights. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

The events subsequent to the arrest, although not commendable acts on the part of law enforcement, do not constitute a part of the "purpose and flagrancy" of the misconduct, i. e., the illegal arrest. The obvious reason is that the arrest is illegal *only* because the supporting affidavit was insufficient. The events that occurred *after* the "illegal arrest" go to the voluntariness of the confession, an issue already decided adversely to appellant.

Therefore, I believe the facts of this case are clearly distinguishable from the *Dunaway* and *Brown* scenarios. Our case was based upon an arrest warrant, supposedly supported by probable cause. Officers, acting in good faith, validly executed that warrant. In *Dunaway* and *Brown*, both arrests were made without warrants and without probable cause which was acknowledged by the prosecution. Such is not the situation we have here.

I would hold that the good faith of the officers and the *Miranda* warnings is sufficient to purge the taint of the illegal arrest. Compare, *United States v. Janis*, 428 U.S.

433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (evidence seized in good faith *not* suppressed in civil tax case which was seized based on an insufficient supporting affidavit to the search warrant); *People v. Lent*, 433 N.Y.S.2d 538 (Misc.2d Sup.1980) (teletyped arrest warrant subsequently held invalid; however, the good faith action of police officers prevented suppression of evidence from the search incident to that arrest); *People v. Pierce*, 88 Ill.App.3d 1095, 44 Ill.Dec. 326, 411 N.E.2d 295 (Ill.App.1980) (search warrant subsequently held invalid; however, evidence seized and confession of suspect admissible due to officers' reasonable, good faith belief that warrant was valid).

Furthermore, such a conclusion would fully comport with the recent rule adopted by the Fifth Circuit Court of Appeals in *United States v. Williams*, 622 F.2d 830 (5th Cir. 1980). That Court, sitting en banc, made an exhaustive analysis of the exclusionary rule. They went on to rule that henceforth in that circuit, evidence obtained by police conduct that is alleged to be unlawful shall not be suppressed if the government establishes that the conduct, if mistaken or unauthorized, was taken in the reasonable good faith belief that it was ·proper.[6]

The court emphasized that the exclusionary rule is not itself a constitutional requirement, but is a "judge-made rule crafted to enforce constitutional requirements, justified in the illegal search context only by its deterrence of future police misconduct." 622 F.2d at 841–842. Recognizing that the judicially created exclusionary rule is ineffective where the officers' conduct is neither willful nor negligent, the Fifth Circuit adopted part of Justice White's dissent in *Stone v. Powell*, supra:

"When law enforcement personnel have acted mistakenly, but in good faith and on reasonable grounds, and yet the evidence they have seized is later excluded, the exclusion can have no deterrent effect. The officers, if they do their

---

6. The Fifth Circuit felt that at least "four current members of the United States Supreme Court have urged the adoption of a good-faith exception to the exclusionary rule." *United*

States v. Williams, supra, at 841 (quoting Ball, *Good Faith and the Fourth Amendment: The "Reasonable" Exception to the Exclusionary Rule*, 69 J.Crim.L. and Criminology 635 (1978).

duty, will act in similar fashion in similar circumstances in the future; and the only consequence of the rule as presently administered is that unimpeachable and probative evidence is kept from the trier of fact and the truth-finding function of proceedings is substantially impaired or a trial totally aborted."

The United States Supreme Court has rejected the rule that *Miranda* warnings will, per se, cure the taint of a confession which followed an illegal arrest. Likewise, the Court has rejected the other extreme; i. e., that a confession following an illegal arrest must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The application of the exclusionary rule to the voluntary confession of appellant in this case does nothing to accomplish its stated purpose. The State sufficiently proved that the officers acted on a reasonable, good-faith belief that the arrest warrant was valid. If the circumstances were repeated, there's no doubt that the officers would pursue the same course of conduct.

Until the United States Supreme Court is presented with the opportunity to reject or accept the reasonable good-faith exception to the exclusionary rule, I respectfully dissent.

W. C. DAVIS, J., joins this dissent.