**Charles Odis HOBSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 41848.**

Court of Criminal Appeals of Texas.

March 19, 1969.

Thomas E. Berry, Chester E. Darnell, Houston, for appellant.

Carol S. Vance, Dist. Atty., Phyllis Bell and Joe Maida, Asst. Dist. Attys., Houston, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

WOODLEY, Presiding Judge.

The offense is assault with intent to murder with malice; the punishment, 8 years.

Trial was before a jury on a plea of not guilty and the punishment was assessed by the jury.

The sufficiency of the evidence to sustain the finding of the jury is challenged.

Mary Jean ————, upon whom the assault was alleged to have been made, was the ten weeks old daughter of the state's principal witness who testified in part that while she was living with appellant, though not married to him, something unusual happened to her baby, Mary Jean.

"Q. What happened to the baby?

"A. Well, the baby started crying about 7:00 o'clock in the morning, I believe

it was, and he started hitting her with his hand.

"Q. Who is he?

"A. Charles Odis Hobson.

"Q. How did he start hitting her?

"A. With his hand.

"Q. Was the baby in its crib? What did the baby sleep in?

"A. A little bathtub. A little plastic bathtub.

"Q. Where was the baby when he started hitting her?

"A. In the crib.

"Q. Where was the crib?

"A. Right next to the bed close to where I slept.

"Q. On the floor?

"A. On the floor, uh huh.

\* \* \* \* \* \*

"Q. (By Mr. Maida) Mrs. Wahl, what time of day or night did this happen?

"A. I think it was about 7:00 o'clock that morning.

"Q. And do you recall how many times the defendant struck the baby?

"A. No.

"Q. How was—were the blows light blows or hard blows?

"A. Well, they were pretty hard.

"Q. Was he saying anything to the child when he struck it?

"A. Just telling her to quit crying.

"Q. What did you do?

"A. I got up there close and tried to get him to stop—tried to stop him every way I could and I couldn't stop him. I couldn't do anything with him. I was begging him to stop hitting her.

\* \* \* \* \* \* .

"Q. \* \* \* What happened after that, after he slapped the baby?

"A. Well, the baby died.

"Q. How do you mean the baby died?

"A. Well, she did. She was dead. She got as limber as a dishrag and she was dead. He first run water over her from the faucet and then mouth to mouth *respiration* but she was dead.

"Q. What did you do during this time?

"A. I just went almost to pieces and kept begging him to take her to the doctor. I just went all to pieces. I got to where I couldn't even stand to look at her anymore.

"Q. Did he agree to take her to the doctor?

"A. No.

"Q. What happened? Did you finally go to the doctor?

"A. Yes, about 7:30 or 8:00 o'clock we finally took her out to Ben Taub.

"Q. About 7:30 or 8:00 o'clock that morning?

"A. No, that night.

\* \* \* \* \* \*

"Q. What did you tell them at the hospital at first?

"A. Well, I told them the truth what happened to the baby.

"Q. Well, now, at first—when you first got there what did you tell them?

"A. I told them what they asked me about the baby. They asked me what happened to the baby and I told them.

"Q. What did this defendant tell you to tell about the baby?

"A. That this baby had hurt itself, that I fell down over the rug and fell and hit the baby when I fell.

"Q. Did you fall down over the rug and hit the baby when you fell?

"A. No.

\* \* \* \* \* \*

"Q. What was the defendant's words when he was slapping the baby? Was he mad or calm or what?

"A. Mad.

"Q. Had the baby *woke* you all up?

"A. Yes.

"Q. And the baby started crying and that's when he started beating on the baby?

"A. Uh huh."

Dr. Al Jaffee, who at that time was a resident in pediatrics assigned to Ben Taub Hospital, testified and the medical records of said hospital concerning Mary Jean were introduced.

Dr. Jaffee testified that he first saw Mary Jean on April 1, 1967, at Ben Taub Hospital, and treated her.

"Q. All right, what was the child's condition the first time you saw it?

"A. The child—when I saw the child, it had marked rigidity of the arms and legs. The child was quite lethargic, was eating very poorly and had some seizure activity at that time.

"Q. Medically speaking, what would be the medical cause of these seizures of rigidity of the arms and legs?

"A. The child had an accumulation of fluid and blood in the brain and about the brain at that time.

"Q. What would cause the fluid in this brain?

"A. Some type of trauma or blow to the head itself would probably cause these areas of blood accumulation.

"Q. All right now, what was the child's condition at that time as far as being fair, critical, serious or what?

"A. The child was critical at the time I first saw the child.

"Q. Do you know what treatment was given for the child?

"A. Yeah, the child had been admitted to the hospital. I think two days before, and appeared to be very lethargic. The child's soft spot was quite enlarged, probably because of fluid underneath the scalp and underneath the skull. The child had marked bruising on both sides of the face. A puncture was done and a needle inserted on each side of the soft spot of the head and fluid was drawn out of the right side of the head. This was repeated two or three days after admission until there was much more fluid to be drawn off of the top of the scalp.

"Q. These seizures the child had, what would that indicate, Doctor?

"A. That the child probably had some bleeding somewhere in the brain.

"Q. Was there any damage to the brain of this child itself?

"A. That is difficult to establish. We could not see the damage. We did some brain wave tracings which indicated some brain wave abnormality at the time.

\* \* \* \* \* \* \*

"Q. (By Mr. Maida) Doctor, can you tell from the records and as to the examination you made of the location of the bruises?

"A. Oh, here it is. The child had numerous bruises about the face.

"Q. All right, sir. I believe you said you recall approximately three that you can remember?

"A. Yeah.

"Q. All right, Doctor, do you have an opinion as to whether or not these bruises could be caused by an adult slapping the baby about the face?

"A. Yes sir, it is possible.

\* \* \* \* \* \*

"Q. Doctor, you said that in your opinion that these bruises could have been caused by striking. Could these bruises have been caused by one or more falls of the baby from somebody's arms to the floor, dropping and falling and that type thing?

"A. Yes, they may have.

\* \* \* \* \* \*

"Q. Doctor, you said these bruises could have been caused by the baby falling. The location and extent of the bruises, could it have been caused by one fall?

"A. I doubt it, no.

"Q. It would have had to have been more than one fall then to cause that degree of damage?

"A. Multiple falls."

Appellant testified in his own behalf. His version was that he was attacked on the night before and had no recollection of what occurred on the morning he, according to Mary Lou, assaulted her infant daughter Mary Jean, and that he could not have committed the assault because he couldn't get out of bed during that time.

Appellant also testified that he saw Mary Lou spank the baby in the afternoon and that she told him that she dropped Mary Jean.

The contention is advanced that the evidence is insufficient to show an intent to kill the baby.

■ Hignett v. State, 170 Tex.Cr.R. 342, 341 S.W.2d 166, which appellant seeks to distinguish, is deemed authority for upholding the jury's verdict. In view of the tender age of the child; the extent of the injuries inflicted; the continued assault in spite of the mother's begging him to stop it; the long delay in seeking medical aid for the baby, in spite of the mothers' pleas; and the attempt to have the mother give a false explanation of the injuries, we find the evidence sufficient to sustain the jury's finding that appellant committed the assault with malice and with intent to kill.

In Hignett v. State, supra, we said:

"It would be difficult to envision a set of facts showing an adequate cause for such an assault by a sane man upon a three months old baby or showing a purpose of the person wilfully inflicting such injuries by an assault other than to take the life of the baby."

In Smith v. State, 160 Tex.Cr.R. 227, 268 S.W.2d 144, we said:

"An assault with intent to murder upon a helpless child between 9 and 11 months old could consist of the slightest violence applied to its tender body and not necessarily be confined to a vigorous assault as would be necessary against a person of mature age."

See also Phillips v. State, Tex.Cr.App., 216 S.W.2d 213.

■ Appellant's second ground of error is predicated upon certain entries in the hospital records which indicate that the baby's injuries occurred at an earlier time which, together with other evidence, would indicate that the assault, if any, was not committed in Harris County.

At most this evidence presented a conflict to be resolved by the jury. No such issue was submitted and there are no objections to the charge because of the omission.

■ Ground of error No. 3 complains of the overruling of appellant's motion for mistrial on the ground that the witness Mary Lou violated the rule (Art. 36.03 Vernon's Ann.C.C.P.) in conversing with another witness in the hall outside the courtroom.

Violation of "the rule" is not in itself reversible error or ground for mistrial. No objection was made to either witness being permitted to testify following the claimed violation of "the rule."

■ Ground of error No. 4 complains that the infant child was not brought to court in response to a subpoena for Mrs. Kongable, Assistant Juvenile Probation Of-

ficer for Harris County, who testified that Mary Jean was in an adoptive home, the parental rights of her mother having been terminated by court order.

Trial was some ten months after the child was injured. There is nothing in the record to show that the failure to exhibit the infant to the jury at the trial could have in any way affected the fairness of the trial.

▮ The remaining ground of error relates to the testimony of Mary Lou, the mother of the infant child, who the brief brands as "a liar unworthy of belief," the contention being that appellant was denied a fair trial in that her testimony "was considered by the jury after thorough impeachment and the state failed to corroborate her testimony."

The credibility of the witness and the weight to be given her testimony was for the jury. Art. 38.04 V.A.C.C.P.

The judgment is affirmed.

DOUGLAS, J., not participating.