Pedro **ENCINA**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 44019.

Court of Criminal Appeals of Texas.

July 14, 1971.

Rehearing Denied Oct. 26, 1971.

Wm. G. Burnett, Burnett & Burnett, Sinton (Court appointed on appeal only), for appellant.

Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

MORRISON, Judge.

The offense is murder; the punishment, fifteen (15) years.

Appellant, in his first three grounds of error, challenges the sufficiency of the evidence.

The entire case against the appellant is made out in the testimony of two physicians and the confession of the appellant. His confession reads as follows:

"My name is Pedro Nanez Encina I'am 20 years old. . . Last Sunday night October 12th, 1969 at about 10:00 P.M. I was at home my father's house in Mathis, San patricio County, Texas. When my Comman law's wife's baby David _____ said he wanted to go to the rest room, and all that we have is an out house toilet and it is a little ways behind the house, so I took David to the toilet and he squated down and relieved himself when David got thru I sat down on the stool and I hollard at my brother Lupe to brig me some matches so that I could light a cigarret while I was wait-

ing for lupe to bring me some toiler paper and some matches I got thru and David went Outside and I told him to go inside the toilet and at the same time I pushed him and he fell down backward on the steps of the toilet and when he got up I pushed him again I pushed David down 3 or 4 times. Then I seen that dacid did not get up or move so I checked on him and it seem that he was passed out so I got scared and called my comman law wife Enedelia _____ and I told her that the baby out and that I did not know what was wrong with him and Enedelia came and took David from my arms and went inside of the housse with him I then asked my father for the keys to his pick up and took my wife Enedelia my sister Juana and David to the Hospital in Sinton, San Patricio County, Texas I do not know why I knocked David down 3 or 4 times because I was not drunk.

/s/ Pedro Encina"

Dr. Joe Pinkston, a physician and surgeon, testified that he first saw the deceased child in the emergency room of Sinton Hospital at 10:30 P.M., October 12, 1969. At that time the child was strangling on his saliva. The doctor established an airway, then discovered that the child was unconscious and had a "chyes-stokes type of respiration which you see in a terminal injury," and that his pupils were dilated and fixed. The back of the child's head was "quite soft and mushy" and the doctor determined that he had sustained a "pretty good injury" to the back of the head. There was also "one continuous bruise" from both elbows and around the back on the upper part of the torso. The child died at 2:54 A.M. on October 13th. The doctor stated that emergency room records showed that the child was two years old.

Dr. Robert J. Nelms, Jr., a pathologist, testified that he performed an autopsy on the body of the deceased on October 13th. The child, who was approximately two years old, was found to have multiple bruises on the scalp, face, shoulders and

chest. The pathologist testified that death resulted from bleeding between the brain and the skull and the accompanying brain swelling. All of the injuries to the deceased occurred within twenty-four to forty-eight hours prior to the autopsy. Dr. Nelms testified that the injuries were caused by contact with a blunt object, that this blunt object could have been a wall or a step, and that the child might have been injured by falling "into the object or vice versa."

Appellant does not contend that the evidence is insufficient to show that he killed the deceased. Cf. Steel v. State, Tex.Cr. App., 459 S.W.2d 649. His main contention is that the State failed to show malice or even the intention to kill.

This Court has considered similar contentions on several occasions. In Smith v. State, 160 Tex.Cr.R. 227, 268 S.W.2d 144, the accused was convicted of assault with intent to murder with malice on a baby about 9 or 11 months old. In that case, the baby had numerous bruises and cuts, as well as several fractures, and was having a great deal of difficulty in breathing. One witness heard a beating going on in the home of the child; she came to investigate and the child's mother placed the bloody baby in her arms. She also saw blood on the sink and on the wall. The accused's confession recited that he had hit her with his fist and burned her with cigarettes on several occasions. It also stated that he had, on the day he took the baby to the hospital, hit the baby with his fist while she was in the sink. In affirming the conviction, this Court said:

"An assault with intent to murder upon a helpless child between 9 and 11 months old could consist of the slightest violence applied to its tender body and not necessarily be confined to a vigorous assault as would be necessary against a person of mature age."

In Hobson v. State, Tex.Cr.App., 438 S.W.2d 571, the accused was shown to have repeatedly struck a baby, who was ten weeks old, with his hand while the mother was begging him to stop. The baby went limp and failed to respond to mouth to mouth respiration. Hobson refused to take the baby to a hospital until some twelve hours later. A doctor who examined the baby testified that the child had an accumulation of fluid and blood in the brain, an enlarged soft spot, and marked bruising on both sides of the face. He testified that the injuries could have been caused by someone hitting the child or by multiple falls.

This Court held:

"In view of the tender age of the child; the extent of the injuries inflicted; the continued assault in spite of the mother's begging him to stop it; the long delay in seeking medical aid for the baby, in spite of the mother's pleas; and the attempt to have the mother give a false explanation of the injuries, we find the evidence sufficient to sustain the jury's finding that appellant committed the assault with malice and with intent to kill."

In another assault with intent to murder case, Hignett v. State, 170 Tex.Cr.R. 342, 341 S.W.2d 166, the accused's confession showed that he hit the three-months-old victim a number of times. Medical testimony established that there were multiple bruises, that a leg bone was fractured, that there was marked swelling of both legs and that there were several other fractures. A physician testified that it would have taken a hard blow to have caused these injuries to the baby. Hignett's wife testified that a third party caused the injuries. In affirming the Hignett conviction, this Court said:

"Aided by the confession and the nature and extent of the injuries and by appellant's false explanation, we conclude that the evidence is sufficient to sustain the finding by the jury that the baby's injuries resulted from an unlawful assault by appellant.

"In view of the tender age of the child, the nature and extent of her injuries, and the statement and confession of appellant, we also find the evidence suffi-

cient to sustain the jury's finding that appellant committed the assault with malice and with intent to kill.

"It would be difficult to envision a set of facts showing an adequate cause for such an assault by a sane man upon a three months old baby or showing a purpose of the person willfully inflicting such injuries by an assault other than to take the life of the baby."

In the case at bar, the confession shows that appellant pushed or knocked the child down three or four times causing him on at least one occasion to hit some steps as he fell down backwards. The medical testimony established that the back of the child's head was severely injured and that this injury caused his death.

■ In considering whether or not an assault was committed with the intent to murder, this Court must take into account the extent of the injuries and the relative sizes and strengths of the parties. There is no question but what this child was a practically helpless two-year-old. Any violent assault on such a baby may be reasonably expected to cause death. We are not dealing with a simple spanking. The appellant intentionally pushed the baby into some steps on at least one occasion and knocked him down three or four times; the nature of the injuries is sufficient to show that the attack was of a violent nature. As was said by the prosecutor in Hignett, supra:

"Specific intent to kill; to destroy. You couldn't take a little animal; a tender little animal of any kind there and put it on that table or on a bed and beat it like that without intending to kill it."

We find the evidence sufficient to sustain the conviction.

■ In his ground of error number four, appellant contends that the order entered by the trial court finding his confession to be admissible was not in compliance with Art. 38.22, Vernon's Ann.C.C.P. and that, therefore, the confession should not have been admitted. Basically, appellant asserts that the order of the trial court, under Section 3 of Art. 38.22 must contain findings of fact which track the entire warning given to him. The Court did make certain findings of fact in regard to what warnings were given to appellant. At the conclusion of his order, he found, beyond a reasonable doubt that appellant's confession was freely and voluntarily made and that such confession was admissible. Although it would have been a better practice for the trial court to have made more complete findings of fact, under the circumstances of this case, which are set out below, appellant was not harmed by the failure of the court to do so.[1]

In his last three grounds of error, appellant contends the State did not show that he voluntarily waived his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, before making the confession quoted above. First, he contends that, as there was no affirmative statement on the part of the appellant that he wished to waive his constitutional rights, the trial court erred in finding that his confession was admissible. His second contention is that appellant was mentally incapable of waiving these rights.

It appears from the record that some five days after the killing, appellant was taken before Justice of the Peace C. D. Caffall, and warned of his rights. This occurred

1. Trial courts provide an invaluable service by making complete findings of fact as required under Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 and Lopez v. State, Tex.Cr.App., 384 S.W.2d 345. Where the facts in issue are strongly contested, it is virtually impossible for this or any other reviewing court to determine whether or not the confession was voluntary without ordering a new hearing and new findings of fact. More complete findings of fact often eliminate the necessity for such hearings when the confession is attacked after conviction.

at 6:08 P.M. At 10:40 A.M. the next day, appellant was again warned and gave a confession. At the top of this confession, after a recitation of the warnings given by Judge Caffall, the following is printed: " * * * and I do hereby voluntarily waive these rights and give * * * the following statement * * *." Appellant makes no assertion that he was actually coerced or enticed into giving the confession.

A portion of the trial court's order holding the confession admissible is as follows:

" * * * the defendant was carried before C. D. Caffall, a magistrate, who informed the defendant of the accusation against him and of any affidavit filed therewith, of his right to retain counsel, of his right to request appointment of counsel if unable to obtain counsel and of his right to have an examining trial and that he was not required to make a statement and that any statement made by him might be used against him, and after having further been warned by Joe Zapata, the person to whom the statement was made, first, that he did not have to make any statement at all, and, second, that any statement made by him might be used in evidence against him on his trial for the offense concerning which the confession was made, the defendant did then and there make the said written confession, and the trial court further found that said confession had been freely and voluntarily made and that there was no coercion and no mistreatment exercised on the defendant and there were no promises or threats made to defendant."

The testimony of Chief Deputy Sheriff Joe Zapata also shows that Judge Caffall told appellant that he had a right to have a lawyer present to advise him prior to or during any questioning and that if he was unable to employ a lawyer for this purpose one would be appointed, and that he had the right to stop talking at any time. Zapata stated, in regard to whether or not appellant wanted a lawyer, that appellant said he wanted to go ahead and get bond set, try to make bond, "and get his own lawyer and work on his case."

Additionally, Deputy Zapata testified that he warned appellant in Spanish that he had the right to remain silent; that he did not have to make any statement to anyone; that any statement he made could and would be used as evidence against him in a court of law; that he had a right to obtain a lawyer or if he was too poor to hire one that the court would get him a lawyer "free of cost to you or anybody else;" that "you have the right to have your lawyer present when you are—to let you know about the proceedings and you have the right to— warn you about any questioning by any officials of the law or lawyer representing the State;" that, if he decided to talk he could talk to anyone or that he could stop talking at any time he wanted to; and that the rights mentioned were continuing rights and could be urged by him at any time of the proceedings. Appellant replied that he understood his rights and that he wanted to give a statement.

The trial judge, as reflected by the statement of facts, specifically relied on the testimony of Deputy Zapata in holding that the confession was admissible.

Appellant, in order to show that he was incapable of making an intelligent waiver of his constitutional rights, introduced the testimony of his counselor in elementary school. Her testimony showed that he had done poorly in school from the time that he entered, around 1958, until he left, which was apparently in 1964. Her records also showed that he had been absent from school a great deal of the time and that, some five years prior to the time that he made the confession, he had registered an I.Q. of 64 or that "of the highest of what is considered mentally moron."

Further testimony which might relate to appellant's waiver of his rights was volunteered by Deputy Zapata on direct examination. He stated that he took the above statement from appellant, typing it him-

self, and that appellant then signed it. Zapata subsequently had it retyped, after corrections for spelling and grammatical errors, by his secretary, and attempted to have appellant sign the new copy. Appellant then stated that his lawyer had told him not to do anything more about the statement and Zapata made no further request. A day or two later, appellant called Zapata and said that he wanted to sign the retyped statement. Zapata replied that he would rather appellant did not sign the statement as his lawyer had advised him against it. The retyped statement was never signed or offered into evidence.[2] There is nothing in the record to indicate whether. or not appellant actually had an attorney at that time.

 The trial judge, as shown by his order and his remarks during the course of the hearing out of the presence of the jury carefully considered all the evidence in regard to the confession before he admitted it, including the evidence favorable to the defendant. He concluded that the statement was voluntarily made, and we cannot conclude otherwise. The warnings given to appellant were in compliance with Art. 38.22, supra, and Miranda v. Arizona, supra. At the top of his confession, appellant made a statement waiving his rights. Although such statement is a factor to be considered in determining if appellant affirmatively waived his rights, it is not determinative thereof. McCandless v. State, Tex.Cr.App., 425 S.W.2d 636. In order to determine whether or not appellant waived his rights under Miranda, supra, we must look to all the facts and circumstances surrounding the taking of the confession. As was said in Narro v. United States, 370 F.2d 329 (5th Cir., 1966):

"* * * the cases in which it is clear that the warnings have been given must be considered on their own facts in order to determine the question of waiver. The courts must do this on an *ad hoc* basis, since no *per se* rule has thus far been adopted dealing with this problem."

 We deem the totality of circumstances set forth above ample to show that the confession was freely and voluntarily made by appellant after he had been fully apprised of his constitutional rights and had affirmatively and intelligently waived these rights. McCandless v. State, supra; Easley v. State, Tex.Cr.App., 448 S.W.2d 490; Miller v. State, Tex.Cr.App., 468 S.W.2d 818.

 Appellant asserts that, although the circumstances surrounding the confession may make it appear that he intelligently waived his rights, he could not make an intelligent waiver of these rights because "the evidence conclusively established that appellant lacked the mental capacity necessary to a voluntary waiver of those rights." While it is true that the testimony of the school counselor raises an issue of fact as to whether or not appellant had the mental capacity to make a voluntary waiver of his rights, it does not clearly show that appellant was incapable of waiving his rights. Appellant was present before the trial court throughout the trial. The trial court was in a position, therefore, to assess the appellant's mental capacity and he determined that appellant was competent to waive his rights. Suffice it to say that the record before us shows sufficient evidence for the trial court to conclude beyond a reasonable doubt that appellant voluntarily waived his constitutional rights, de-

2. It is to be noted that the failure to sign the second copy of the statement is distinguishable from the situation presented in United States v. Phelps, 443 F.2d 246 (5th Cir. 1971). In Phelps the accused refused to sign a waiver of his constitutional rights after verbally stating that he understood his rights and that he did not want a lawyer present. Subsequent to this refusal, Phelps made incriminating statements. The Phelps case was sent back to the trial court for determination as to whether or not the incriminating statements were a result of interrogation by officers or of voluntary conversation initiated by Phelps.
In the case at bar, the refusal to sign came after the giving of the confession. No further action was taken by Deputy Zapata after such refusal.

spite testimony regarding an I.Q. test that was taken five years prior to the confession.

Finding no reversible error, the judgment is affirmed.