Joseph Anthony **MARTINEZ**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–81–00089–CR.

Court of Appeals of Texas,
San Antonio.

June 29, 1983.

Discretionary Review Refused
Nov. 23, 1983.

---

Alonzo Villarreal, Jr., Uvalde, for appellant.

Earle Caddel, Dist. Atty., Uvalde, for appellee.

Before ESQUIVEL, CANTU and TIJERINA, JJ.

## OPINION

ESQUIVEL, Justice.

Appellant was charged by indictment with the offense of murder. After a jury trial, on a plea of not guilty, appellant was found guilty of voluntary manslaughter. The jury assessed punishment at ten years' confinement in the Texas Department of Corrections. Appellant presents us with two grounds of error.

Appellant was charged with the murder of Reynaldo Flores Sanchez, by shooting him with a gun. The body of the deceased was found in the Leona River at Fort Inge Park in Uvalde County, Texas, on October 16, 1978. During the course of the afternoon and evening of October 16, 1978, appellant and the deceased had several confrontations during one of which the deceased allegedly hit appellant, knocking him down. Later on that evening, the deceased is said to have told appellant, "Your life is coming to an end." Appellant testified that thereafter, everything was fine until they were preparing to leave. At that time, the

deceased asked appellant for a ride home. In appellant's own words:

A. That's when it started all up again.

Q. How did it start up again?

A. I walked back to the truck, ... to use the restroom. He come [sic] back there ... when I turned ... he kind of pushed me up against the back of the truck. Then when I started going back around ... to get in. That's when he pulled this knife out again. He told me, he said, 'you are dead ...' The gun was there. I got the gun. I didn't know it was loaded or anything. I just got the gun to protect myself....

According to appellant, the gun then went off accidentally when the deceased "grabbed it and pulled it."

On October 18, 1978, appellant and Michael Tate, who had been with appellant on the afternoon and evening of October 16, 1978, voluntarily appeared at the Uvalde County Sheriff's office. It was there that appellant signed a statement confessing to the murder.

In ground of error number one, appellant complains that the trial court erred in admitting appellant's written confession because the confession was not made knowingly, intelligently, and voluntarily. Appellant moved to suppress the confession. The court, in accordance with *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) and Tex.Code Crim.Proc.Ann. art. 38.22 (Vernon 1979), conducted a hearing outside the presence of the jury, and at which appellant testified, to determine the voluntariness of appellant's confession. Subsequently, the trial court entered an order finding that:

... the defendant was fully apprised of all ... rights, and he knowingly, intelligently, and voluntarily waived all of these ... rights prior to and during the making of the statement, and that he thereafter did make the written statement and the court is of the further opinion that said statement was made voluntarily and should be admissible as a matter of law and fact.

Furthermore, the court submitted the question of the voluntariness to the jury in its charge.

■■■ It is well settled that before a confession can be admitted into evidence, it must be shown to have been freely and voluntarily given. *See Barton v. State,* 605 S.W.2d 605, 607 (Tex.Cr.App.1980). The determination on whether a confession is voluntary must be based upon an examination of the totality of the circumstances surrounding the acquisition. *Berry v. State,* 582 S.W.2d 463, 465 (Tex.Cr.App.1979). We turn then to the facts of this case.

As previously noted, appellant and Michael Tate voluntarily appeared at the Uvalde County Sheriff's Office on October 18, 1978. Appellant was not under arrest nor was he summoned to appear. According to appellant himself, it was his idea "to go down to the sheriff's office." "... I needed to get it out of me. That's why I went down there, to tell them what had happened."

The sheriff's office was at that time interviewing witnesses in connection with the investigation of the deceased, Reynaldo Flores Sanchez. Once at the sheriff's office, appellant was taken into one room and Michael Tate into an adjoining one. Present were Texas Ranger H.J. Jackson, Deputy Sheriff Al Martinez and Deputy Sheriff Clyde Hobbs. According to Ranger Jackson, immediately after appellant sat down, he began talking and told Jackson that he (appellant) thought he and Michael Tate were probably the last ones to see the victim at Fort Inge; that they had left with the victim and gone into town but then had dropped the victim off at Memorial Park; thereafter, he and Michael Tate had gone to kill a deer.

According to Jackson, it was after appellant was through relating this story that he became suspicious. It was then that Officer Martinez in the presence of Ranger Jackson advised appellant of his rights as set out in a waiver of rights form. According to Ranger Jackson, appellant admitted understanding the rights read to him. The

"Waiver of Rights" form signed by appellant reads as follows:

### Waiver-of-Rights Form

On the __18__ day of __October__, 19 __78__, at 2:30 P. __M.__, __H. Joaquin Jackson__ advised me, __Joseph Anthony Martinez__ that I did not have to tell him anything; that anything I did tell him might be used in evidence against me in a court of law; that I had a right to an attorney; that I had a right to have the attorney present while the officer was talking to me or questioning me; that if I could not afford an attorney or lawyer, one would be obtained for me; that I did not have to say anything to the officer until my attorney or lawyer was present; that if I talked to the officers I could terminate or stop talking to the officers any time I wanted to and that any time I desired, an attorney would be called to assist me and no questions would be asked me until the attorney arrived.

__/s/ Joseph Anthony Martinez__
(signature of subject)

I, __H. Joaquin Jackson__, a member of the (officer) __Texas Rangers__ on the __18__ day of October, 19 __78__, at __2:30__ P.M., administered the foregoing warning to __Joseph Anthony Martinez__ before commencing an interview with him. He (signed) (refused to sign) the waiver.

__/s/ H. Joaquin Jackson__
(signature of officer)

/s/ Al Martinez

/s/ Clyde Hobbs

With respect to this waiver, the following colloquy took place during cross-examination of appellant:

Q. ... State's exhibit 2 which is a waiver of rights you gave that. Does that have your name on it?

A. Yes, sir, it does.

Q. Did you sign that?

A. Yes.

Q. That's after you went down there to give yourself up?

A. Yes.

A. Yes, sir.

1. The entire confession was admitted into evidence. A portion of it was introduced by the

After appellant signed the "Waiver of Rights" form, Ranger Jackson, who had left the office momentarily, returned and advised appellant that Michael Tate had implicated him in the killing and that he "was probably going to be charged with capital murder." According to Ranger Jackson, "At the time the man's clothing was gone, and his pants were gone. We didn't know but what the motive might have been robbery."

After appellant agreed to make a statement, Officer Martinez administered the warnings and explained them to him before taking his statement in longhand. When appellant began making his statement, Ranger Jackson left and returned five or ten minutes later to continue taking the statement as Officer Martinez left to make a phone call. The statement was then typed onto a form which contained the warnings required by art. 38.22. According to Ranger Jackson, appellant after reading the statement and prior to his signing it, was asked if he had read the whole statement, and if he understood the rights as set out in the statement. Appellant advised them he did. Appellant's statement [1] recounting the instant offense reads as follows:

I Joseph Anthony Martinez, before being interviewed, interrogated or questioned by H. Joaquin Jackson on October 18, 1978 at 2:47 P. M., at Sheriffs Dept. and before making this statement was warned by H. Joaquin Jackson, the person to whom this statement is given, that (1) I had and have the right to remain silent and not make any statement at all and that any statement I make may be used in evidence against me at my trial; (2) I had and have the right to an attorney, and that if I am unable to employ an attorney one will be provided for me; (3) I had and have the right to have an attorney or lawyer present to advise me prior to and during any questioning or interrogation by peace officers or attorneys for the State; and

State and the remaining portion was introduced by appellant.

(4) I had and have a right to terminate the questioning, interview or interrogation at any time.

I understand my rights as set out in this warning and knowing what they are I freely and voluntarily, without being forced or compelled by promises, threats or persuasion, waive these rights and make the following statement in writing: My name is Joseph Anthony Martinez

My name is Joseph Anthony Martinez, I am 19 years of age, my [D]ate of birth is August 22, 1959, my address is Apartment 13–B Laurel Apartments, Garner Field [R]oad, Uvalde, Texas.

On Sunday, October 15, 1978, we were at City Memorial Park, at about 3 P.M. or 4 P.M. We, Kenny Martinez (my little brother), Charlie Martinez and myself got to the park. When we got there, Ernie Martinez, my cousin was already at the park, also Rosie Tenorio and Debbie, s[;]he drives a white car, were also there and then they left. Cindy Hartman was also at park when I got to the park. About 40 minutes later when Rosa and Debbie left. And I guess about 30 minutes or so later those other guys came in White [C]hevy, but the black guy was not with them. We hung around and drank beer, about a little bit before dark when Debbie and them came by and brought that guy "Ray" with them, we kept on drinking and everything, about an hour and a half after dark, [that guy called Ray, Said come here a minute I want to talk to you I started over and the guy hit me, I hit the ground, he hit me a few more times, my little brother came over and pulled him away, we talked and everything was all right,] we started drinking, then me, that guy Ray and Jesse Elizondo went to Circle K on South Getty and got some beer, Jesse Elizondo was all ready at the park when I first got there, come to think about it, I got a six pack of Coors and I think they got Sc[h]litz, That w[h]en we started back to the park, [that guy "Ray" said something like "Your life is not very much longer, I don't know just how he said it, but the way I took it I was going to die, he did not say exactly that he was going to kill me.] When we got back to the park, I decided I would leave, Ray asked me where I was going, I said I'm going to leav[e], and he said "I was only joking, come on lets drink another beer, so I stayed there, you know, at the park. Then I went to store the Circle K on East Main with Albert Taylor, everybody pitched in and we got two more cases of beer, we came back to park, thats when Mike Tate came, somebody said lets move the party, the Police had been by a couple of times. Everybody did leave, except me and Mike. Mike said do you want to come with me. I told him I wanted to take my car to my mother's house and I did then.

/s/ J.A. Martinez

Witness: /s/ H.J. Jackson

/s/ Al Martinez

I got in with Mike in his pickup and rode around, stopped at Minit Mart, West side and got a hot sandwich and some cigarettes, then we went on out to Ft Inge and when we got out there all the beer was already gone, then Ernie came to town, then I guess Lara, left after Ernie, we all started leaving, the guy Ray asked me if we would bring him back to town, Mike had went around truck I went to kinda back truck and started using the restroom. [The guy Ray came up and pushed me up against the truck and started it all again, started saying I was going to die, I told him "man your just drunk" I did not know whtat [sic] I had done he said "Your going to die,] I started over to the truck, I did not know where to go, I got the gun, Mike's shotgun, [he already had a knife out I was just holding gun and I was telling him "Put the Knife away, I said why do you want to kill me, he said if I don't somebody else will,] He was shaking all over. [gritting his teeth,] he started saying something, I lifted the gun [I said throw your knife away, he grabbed the barrel and] the gun went off—he went down. I just looked, [I dropped the gun, I started crying, the knife was off kinda in the

grass,] Mike and I drug the body of Ray to the River, [when we came back up I saw the knife and I closed it and threw it out in the river]—Mike drove and I got in the truck, we went to my apartment, and we set in my house and drunk a beer. Mike said he had some clothes that needed to be dried and we came back to town, went to the laundry mat in North Uvalde, across from Minit Mart. We let and I started driving, we rode around, and then I guess we went back to my house I don't know from there, Honest . .

/s/J.A. Martinez

Witness: /s/ H.J. Jackson

/s/ Al Martinez

On cross-examination, the following colloquy took place between the prosecutor and appellant with respect to the statement made and signed by appellant:

Q. Would you look at State's Exhibit 3.

A. Yes, sir.

Q. That's the statement that you gave Joaquin Jackson right?

A. Yes, sir.

.    .    .    .    .

Q. That statement that you gave Mr. Jackson, did you do that voluntarily?

A. Yes sir, I did after I lied to him.

Q. You did after you told him that big lie?

A. Yes, sir.

Q. Then you gave him the statement voluntarily?

A. Yes sir.

The following testimony, also on the subject of the statement or confession made by appellant, was adduced on redirect examination:

Q. Joey, whose idea was it to come up with this story that you initially told Joaquin Jackson?

A. I guess both of us.

*    *    *    *    *    *

A. . . . What we decided, you know, was to lie, when we first went in. I talked to Joaquin and I told him that

but he didn't believe me anyway. So I just went ahead and confessed. . . .

■ The record discloses that the appellant understood his rights and voluntarily waived them, this in spite of his argument that he was physically and emotionally distraught and depressed so as not to support the conclusion that he knowingly, and intelligently waived his constitutional rights. Appellant's testimony referred to his limited education (9th grade), young age (19 years), that he was nervous, confused and had not eaten, slept, shaved, bathed or changed clothes in two and one half (2½) days from the time of the alleged incident, that he broke down at various times during the interrogation, that he was shown pictures of the deceased while in custody, and that he was threatened with capital murder and a possible death penalty while in custody and prior to the giving of his statement. We do not agree that these factors indicate the confession was involuntary.

It is undisputed that at the time appellant voluntarily appeared at the sheriff's office, he was 19 years old, looked tired and nervous and according to appellant himself had not slept, eaten, or shaved, etc. in several days. However, the situation before us is unlike that in *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958), where the appellant, a mentally dull, 19-year-old black was never advised of his rights, was held incommunicado for several days without counsel, advisor, or friend, was refused to make a telephone call, was denied food for long periods and was threatened with mob violence. In the case at bar, none of these circumstances are present. Clearly distinguishable from the case before us also is *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) and *Morales v. State,* 427 S.W.2d 51, 55 (Tex.Cr.App.1968). The appellant in *Mincey* was in the hospital with a tube in his mouth, depressed almost to the point of coma, his condition was sufficiently serious that he was evidently confused and unable to think clearly about the events in question. In *Morales,* the appellant was also in the hospital and weak from the loss of

blood, had 104 degree temperature and was unable to give reasonable answers to the doctor. There is no evidence in the record before us that appellant's physical state, brought on by none other than himself, impaired the control of his faculties to such an extent that he was incapable of waiving his rights. Furthermore, there is also no evidence that appellant was laboring under any mental deficiency.

Instead, we find significant the following testimony adduced from appellant on direct examination:

Q. Joey, when you turned yourself in, when you were interviewed by Joaquin Jackson and Al Martinez, did you really know why you were there?

A. Well, like I say, I needed to get it out of me. That's why I went down there, to tell them what had happened.

Again on direct examination, appellant testified as follows:

Q. Joey, when did you finally decide that you were going . . . to turn yourself in?

A. Well, when we went down there, I thought we should have done that earlier. . . . Then I was afraid, you know I just decided to do it because I thought maybe the reason I was hurting so much was because I was hiding it inside of me. It just kept building up and building up. . . . You don't know what it's like to have to live with it. . . . It's hard.

\* \* \* \* \* \*

As the U.S. Supreme Court so aptly stated in *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037, 1043 (1961), " . . . a confession made by a person in custody is not always the result of an overborne will. The police may be midwife to a declaration naturally born of remorse, or relief or desperation. . . . " The aforementioned testimony is evidence that the confession was the result of a remorseful state of mind rather than an overborne will. This is so, notwithstanding the fact that appellant, after signing a waiver of rights form, but before making a statement, was

told that he was probably going to be charged with capital murder and notwithstanding appellant's contention while on the stand, that Officer Martinez induced him to confess by telling him it would be to his benefit to confess and showed him, through a two way mirror in the room, Michael Tate giving a statement in the adjoining room.

■ There is no evidence that Ranger Jackson actually threatened appellant with capital murder if he didn't cooperate or sign a confession or that appellant gave the confession because Ranger Jackson convinced him he would be charged with capital murder if he refused to cooperate. *See, Honea v. State,* 585 S.W.2d 681, 685–86 (Tex.Cr. App.1979); *See Burks v. State,* 583 S.W.2d 389, 392–93 (Tex.Cr.App.1979); *See Genter v. State,* 473 S.W.2d 35, 36–37 (Tex.Cr.App. 1971); *Cf. Sherman v. State,* 532 S.W.2d 634, 636 (Tex.Cr.App.1976). Significantly, the following testimony was given by appellant on direct examination:

Q. You heard Joaquin testify . . . to the jury the initial story that you told him. . . .

A. Yes, sir. You mean that story when I said . . .

Q. Yes, I mean the one about the deer.

A. Yes Sir, that's what I told him.

. . . . .

Q. Why did you change your mind, Joey?

A. Because you can't hide something like that, you can't.

Both *Berry v. State,* 103 Tex.Cr.R. 465, 281 S.W. 1058 (1926), and *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1959) cited by appellant, are distinguishable from the case before us. In *Berry,* at 1059, the appellant was not given the constitutionally required *Miranda* warnings before making a confession and upon refusing to sign the same, was sent to jail. In *Blackburn,* the court found the defendant was insane and incompetent at the time he confessed. There is no evidence in the record before us that either of these circumstances was present in the case at bar.

Furthermore, appellant's testimony concerning the circumstances under which he made the confession was disputed by Officer Martinez. This gave rise to a question of fact which the trial court, as the finder of fact in a hearing on the voluntariness of a confession, resolved against appellant and so stated in the Order entered. *See Burks* at 393. The trial judge, as the trier of fact, is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *See Burks* at 393. In the instant case, the trial judge resolved the question of fact against appellant. Based upon the totality of circumstances, the trial court did not err in finding appellant's confession was voluntarily and knowingly made. Ground of error number one is overruled.

In ground of error number two, appellant alleges that the evidence was insufficient to support a conviction of voluntary manslaughter under Tex.Penal Code Ann. § 19.-04 (Vernon 1974) because there was no evidence that the appellant's actions were consummated under the influence of sudden passion from an adequaate cause. The indictment returned against appellant alleges that he:

> ... did then and there intentionally and knowingly cause the death of an individual, Reynaldo Flores Sanchez, by shooting him with a gun.

.     .     .     .     .

This charging instrument alleges the offense of murder as defined in Tex.Penal Code Ann. § 19.02(a)(1) and (2) (Vernon 1974).

Although indicted for murder, appellant was convicted of voluntary manslaughter Tex.Penal Code Ann. § 19.04(a) (Vernon 1974). By finding appellant guilty of voluntary manslaughter, the jury found that appellant had caused the death "under the immediate influence of sudden passion arising from an adequate cause." Tex.Penal Code Ann. § 19.04(a).

■ While the evidence does not show that the offense was committed under the influence of sudden passion arising from

adequate cause, § 19.04, appellant's conviction must be sustained if sufficient evidence was introduced to support a finding of guilt on the greater offense of murder. *Curtis v. State,* 573 S.W.2d 219, 221 (Tex.Cr.App. 1978). In reviewing the evidence we are governed by the well established rule that the evidence must be reviewed in the light most favorable to the verdict. *Valore v. State,* 545 S.W.2d 477, 480 (Tex.Cr.App. 1977); *Murray v. State,* 505 S.W.2d 589, 591 (Tex.Cr.App.1974). Furthermore, we must bear in mind that the jury is allowed to accept a portion of a witness's testimony and reject the remaining part. *Valore,* at 480; *Hemphill v. State,* 505 S.W.2d 560, 562 (Tex.Cr.App.1974).

■ Among the evidence which was admitted to support the conviction is the following:

> 1. appellant's testimony that he was at the scene of the crime and that after the victim pulled a knife he went to the truck to get a gun.
>
> 2. that as he (appellant) held the gun, the deceased, "grabbed the end of the barrel" and "it just went off."
>
> 3. the photograph of the victim
>
> 4. and the physical evidence of the gun

*See Valore* at 480.

In the instant case, the jury was authorized to believe appellant's testimony that he was at the scene of the crime with a shot gun which discharged and killed the victim. However, the jury was also authorized to reject appellant's defense of accident and negating his intent to kill the victim. *See Valore* at 480. Furthermore, we are cognizant of the well settled rule stated by the Court of Criminal Appeals in *Flanagan v. State,* Opinion No. 60,580, at p. 5, delivered December 22, 1982, —— S.W.2d —— at p. —— (Tex.Cr.App.1982, not yet reported) that "before the specific intent to cause the death of another person may be inferred from the firing of a shot gun by one person at or toward another person, it must additionally be shown that the firing of the shotgun occurred with the capacity and under such circumstances as are reasonably

calculated to produce the death of the other person." In the instant case, the deceased was no further away from the appellant than the length of the shotgun when the shotgun was fired. It is clear from the evidence that the shotgun which was fired from the aforementioned distance, was capable of causing death. We conclude from the facts and circumstances presented, that the state proved beyond a reasonable doubt that the appellant, when he fired the shotgun, had the specific intent to kill the deceased.

We find that the evidence was thus sufficient to show that the greater offense of murder was committed. Appellant's ground of error number two is overruled.

The judgment is affirmed.

TIJERINA, Justice, dissenting.

I respectfully dissent on the question of the voluntariness of the confession and find unassigned error in the charge.

Appellant and co-defendant Tate went to the Sheriff's Office voluntarily and were interrogated in separate rooms. Appellant admitted that his first oral statement denying knowledge of the killing was false, and when he was told by the officers that Tate had made a statement implicating him with the killing, he agreed to make a written statement. Appellant first signed a waiver of rights form; however, prior to the taking of the written statement the following relevant and undisputed matters occurred:

(1) The officers told appellant that Tate had implicated him with the killing.

(2) Appellant was told that he could be charged with capital punishment which involved the death penalty.

(3) Appellant was shown photographs of the dead body with an L-shaped laceration to the mouth.

Officer Jackson testified as follows:

I went back in the sheriff's office, and *at that time he had already signed this waiver* and he was warned of his rights. At that time I told him that he was going to probably be charged with capital murder and that I wanted the truth about the killing. At that time he broke down and started crying. It took him some five, ten or fifteen minutes before he gained his composure.

While he was crying he was babbling out about how he went down. This was during the five, ten or fifteen minutes and before he regained his composure enough to relate to us what his story was of what happened. But then he would break down, while he was repeating the story, he would break down and cry some more, off and on, and we would have to wait. Then he would tell us some more.

Q: *Did he sign that waiver in front of you?*

A: *Yes, he did.* (Emphasis added.)

The conflict in Officer Jackson's testimony is found in his statement that when he returned to the Sheriff's Office, appellant had already signed the waiver, and his later statement that the waiver was signed in his presence. There is additional undisputed evidence that appellant had not eaten, slept, bathed or changed clothes for two and a half days.

Tex.Code Crim.Proc.Ann. art. 38.21 (Vernon 1979) provides as follows:

A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed.

Generally, before a confession can be admitted into evidence it must be shown to have been freely and voluntarily given. *Taylor v. State,* 630 S.W.2d 824, 825 (Tex.App.—Houston [1st Dist.] 1982, no pet.). The totality of the circumstances must be examined to determine whether a confession is voluntary. *Berry v. State,* 582 S.W.2d 463, 465 (Tex.Cr.App.1979). A confession, in order to meet constitutional standards, must be both voluntary and taken in compliance with the *Miranda* rule; *if it meets one requirement and not the other, it is inadmissible. See Ochoa v. State,* 573 S.W.2d 796, 801 (Tex.Cr.App.1978). It is reversible error for a court or jury to consider truth or falsity, in determining voluntariness of a

confession. *Rogers v. Richmond,* 365 U.S. 534, 543–44, 81 S.Ct. 735, 740–41, 5 L.Ed.2d 760 (1961). The jury finding that appellant knowingly and intelligently waived his constitutional and statutory rights is totally contrary to the undisputed evidence that appellant was physically and emotionally distraught and depressed. When a person taken into custody is too upset to assert or waive his rights knowingly and intelligently, under *Miranda* all questioning should cease until such time as that person is clearly capable of so responding. *See Sample v. Eyman,* 469 F.2d 819, 821 (9th Cir.1972). *See also Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Morales v. State,* 427 S.W.2d 51, 55 (Tex.Cr. App.1968).

Officer Martinez testified that he started taking appellant's statement within ten to fifteen minutes after appellant's arrival at the Sheriff's Office, but left on a call, and that he returned later and witnessed the signing of the statement. The testimony of Martinez pertinent to the waiver of rights issue is as follows:

Q: [Y]ou felt that he truly understood what you were explaining to him?

A: Yes, sir, I believe he did, because I read them carefully one by one to him. I read him everything that was on the form.

Q: Did you ask him specifically each time, 'Do you understand this right?'

A: I asked him at the end if he understood all of the rights on the form.

A failure by the defendant to affirmatively request counsel does not of itself constitute sufficient evidence of a waiver of that right. *Carnley v. Cochran,* 369 U.S. 506, 513, 82 S.Ct. 884, 888, 8 L.Ed.2d 70 (1962). With respect to an *affirmative* waiver of *Miranda* rights, such as the right to counsel, the fact that a statement appears at the top of a written confession waiving counsel is, while a factor, not determinative. All the facts and circumstances must be examined. *Knoppa v. State,* 505 S.W.2d 802, 805 (Tex.

Cr.App.1974); *Encina v. State,* 471 S.W.2d 384, 389 (Tex.Cr.App.1971); *McCandless v. State,* 425 S.W.2d 636, 640 (Tex.Cr.App. 1968).

The question as to the voluntariness of the confession was established by legal and competent evidence, i.e., (1) the physical and emotional state of appellant, (2) the threat of being charged with capital murder, involving the death penalty, (3) the compelled viewing of the photograph of the dead body, and (4) the information that his friend Tate had implicated him with the murder. Appellant testified as to the involuntary aspects of the confession and additionally testified as to exculpatory matters raising the issues of accident and self-defense. The State failed to discharge its burden and present evidence on the issue of voluntariness or disprove the exculpatory statement on the case in chief and after appellant testified.

The *warnings* and *waivers* required by *Miranda* must be *demonstrated by the prosecution at the trial,* or evidence obtained as a result of interrogation cannot be used against the appellant.

Another factor to be considered is that the confession was not obtained in compliance with the strict requirements of Tex. Code Crim.Proc.Ann. art. 38.22, § (2)(a) (Vernon 1979), which in pertinent part provides as follows:

(2) No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:

(a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or *received from the person to whom the statement is made a warning.* . . . [Emphasis added.]

The confession herein recites on its face that appellant before making this statement *was warned by H. Joaquin Jackson the person to whom this statement is given.* (Emphasis ours.) The records reflect that *it was Officer Martinez who gave appellant the warning* and *he did not take the state-*

*ment.* The redirect examination of Officer Jackson reveals the following:

Q: Correct me if I'm wrong, but were you present throughout the time that he was giving the statement?

A: *Not the whole time.* When he began giving the statement to Officer Martinez I left out, and I would have come back in ... I believe Michael Tate and Sheriff Kelley had come back with the murder weapon and I went back in and talked with Tate and Sheriff Kelley. Then I went back into the sheriff's office. *But I was in and out.* (Emphasis ours.)

This question is unlike *King v. State,* 585 S.W.2d 720 (Tex.Cr.App.1979), where the court approved the warning in a written statement because the defendant confessed to the officer who gave him the warning and the same officer was present when defendant dictated his confession to the clerk, notwithstanding that the officer was not present when the confession was signed. Here, it appears that appellant stayed with the clerk typists and both Officers Jackson and Martinez returned when the statement was completed. At the very least, the record was not fully developed in this regard.

The unassigned error issue concerns a fundamentally defective charge which requires reversal. The admissibility of the confession was submitted by the trial court to the jury under instructions to disregard the confession in the event they found reasonable doubt as to whether it was made by appellant voluntarily and without coercion or duress. This is the approved procedure where issues of fact arise as to the voluntariness of the confession. *Prince v. State,* 155 Tex.Cr. 108, 231 S.W.2d 419, 420 (1950). In *Law v. State,* 165 Tex.Cr. 542, 309 S.W.2d 443, 444 (1958), the Court held that when the evidence is conflicting, the jury will determine whether the confession was freely and voluntarily made and also determine the weight to be given the confession. This standard is crucial in this case because the confession includes an exculpatory statement.

In the case at bar, appellant gave notice of appeal on June 27, 1979. Tex.Code Crim. Proc.Ann. art. 40.09(13), was in effect at the time notice of appeal was given in this case. The amendment to Article 40.09 which deleted subdivision 13 became effective September 1, 1981. Article 40.09(13), *supra,* mandated that fundamental error of omission or commission in the trial court's charge must be reviewed in the interest of justice. *See Barnes v. State,* 644 S.W.2d 1, 1–2 (Tex.Cr.App.1982). Just as it is the sole responsibility of a trial judge, and no other, to prepare a proper and correct charge for a jury, it is this court's legal duty not to let fundamental error in a charge go unnoticed. *Doyle v. State,* 631 S.W.2d 732, 736 (Tex.Cr. App.1982).

The fundamentally defective portion of the charge concerns the instructions to the jury for their determination of the voluntariness of the confession, and in pertinent part reads as follows:

You are instructed that you cannot consider such statement or confession as evidence against the defendant unless you believe beyond a reasonable doubt that such statement was made by the defendant after *he was taken before a magistrate and warned by the said magistrate....* (Emphasis ours.)

There is absolutely no evidence that appellant was ever taken before a magistrate or received a warning from a magistrate, before or after the officers obtained the waiver of rights or the confession. The court clearly misdirected the jury on this particular portion of the charge, essential to the defensive issues. The error in the charge goes to the very basis of the case because the charge fails to state and apply the correct law to the fact issue to be addressed by the jury in its deliberation and determination regarding the voluntariness of the confession. *See Williams v. State,* 622 S.W.2d 578 (Tex.Cr.App.1981). The applicable statute considered in the review of this question is Tex.Code Crim.Proc.Ann. art. 38.22 § 7 (Vernon 1979), providing as follows:

When the issue [of the voluntariness of the defendant's statement] is raised by the evidence, the trial judge shall *appropriately* instruct the jury, generally, on the law pertaining to such statement. (Emphasis ours.)

Tex.Code Crim.Proc.Ann. art. 40.03 (Vernon 1979), "Grounds for a New Trial," provides in pertinent part as follows:

New trials, in cases of felony, shall be granted the defendant for the following causes

. . . . .

(2) Where the court has misdirected the jury as to the law, or has committed any other material error calculated to injure the rights of the defendant.

From these statutory provisions it appears that the judge must appropriately instruct the jury and the defendant is entitled to a new trial when the court has misdirected the jury.

Appellant herein has a basic constitutional right to a fair and impartial trial, as well as a right to have the jury make an unbiased and fair determination of the fact issues involving the voluntariness of the confession and the defensive issues contained therein. These rights are mandated by the due process provisions of the Fourteenth Amendment to the United States Constitution and Article I, Section 19, of the Texas Constitution. *See Doyle v. State, supra* at 738. The trial court's mistake in misdirecting and erroneously charging the jury to consider the warning given by the magistrate, if they believed that appellant was taken before a magistrate, is unduly suggestive, and interferes and impairs with appellant's right to trial by jury. *See* U.S. Const. amend. VI, XIV; Tex.Const. art. I, § 10; Tex.Code Crim.Proc.Ann. art. 36.19 (Vernon 1981). *See also Williams v. State,* 547 S.W.2d 18 (Tex.Cr.App.1977).

The trial court's charge on the voluntariness issue requiring a jury finding as to the magistrate's warning tilted the scales. The jury could have reasonably inferred that a neutral, impartial and detached magistrate participated in the process prior to the taking of the statement and that the participation of the magistrate manifested an import of validity. If a trial court fails to *properly* instruct a jury on the law, and on the law as applied to the facts, a jury cannot perform its function of being the exclusive judge of the facts. *See* Tex.Code Crim. Proc.Ann. art. 36.13 (Vernon 1981). The charge on the *magistrate,* deprived appellant of the benefit of whatever credit his testimony might have been given by the jury. "A defendant has the right to be tried according to the substantive and procedural due process requirements of the Fourteenth Amendment." *Rogers v. Richmond, supra,* 365 U.S. at 544–45, 81 S.Ct. at 741–42.

Thus, concerning appellant's first ground of error, I have considered the totality of the circumstances and conclude that the confession was not freely and voluntarily obtained and that appellant did not knowingly and intelligently waive his constitutional and statutory rights. In considering the unassigned error, the entire record and the charge have been reviewed and it is further concluded that the trial court, on the fact issue involving the voluntariness of the confession, committed fundamental error which injured the rights of appellant and denied him a fair and impartial trial.

The judgment should be reversed and the cause remanded.